68 So.2d 726.

### ATLANTA & SAINT ANDREWS BAY RY. CO.

v.

### BURNETT.

4 Div. 741.

Supreme Court of Alabama.

Nov. 12, 1953.

Alto V. Lee, III, and Huey D. McInish, Dothan, for appellant.

Guy Hardwick, Dothan, and Jackson, Rives, Pettus & Peterson, Birmingham, for appellee.

STAKELY, Justice.

This is an action brought by Mrs. Luna Mae Burnett, as administratrix of the estate of Oscar R. Burnett, deceased (appellee), under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for the death of her intestate on April 16, 1951. On the aforesaid date Oscar R. Burnett was an employee of Atlanta & Saint Andrews Bay Railway Company (appellant), which was and is now engaged in the business of operating a railroad for the transportation of freight and passengers in interstate commerce.

The case was tried on a complaint, which had been amended, consisting of four counts designated as A, B, C and D. Count A charged that the death of plaintiff's intestate was the result of the defendant, its servants, agents or employees negligently allowing a railroad car to run over him. Count B charged that the defendant negligently failed to exercise reasonable care to furnish a reasonably safe place for plaintiff's intestate to perform his work as a railroad switchman of the defendant. Count C

charged that the defendant negligently failed to exercise reasonable care to maintain a reasonably safe place for the plaintiff's intestate to perform his work as a railroad switchman. Count D charged that the death of the plaintiff's intestate was the result of the negligence of the defendant, which proximately resulted in whole or in part as a proximate consequence of a defect or insufficiency in defendant's cars, appliances, tracks, road bed and other equipment. Demurrers were overruled as to Counts A, B and C and sustained as to Count D. Thereafter pleas were filed by the defendant on the general issue and contributory negligence. Trial was had and a verdict and judgment rendered in favor of the plaintiff under Count A in the sum of $20,000. The general affirmative charge was given at the request of the defendant as to Counts B and C. There was a motion for a new trial, which was overruled.

The pivotal question on this appeal is the action of the court in refusing the defendant's request in writing for the affirmative charge under Count A.

Oscar R. Burnett was employed on April 16, 1951, the date of his death, by Atlanta & Saint Andrews Bay Railway Company, which was engaged in the business of operating a railroad for the transportation of freight and passengers in interstate commerce. He was a member of a train crew of five men, namely; himself, Ralph Baggett, J. B. Causey, Harry Stevens and Herbert Kirvin. Ralph Baggett was the conductor or switching foreman. J. B. Causey was the footboard man. Harry Stevens was the engineer and Herbert Kirvin was the fireman. Oscar R. Burnett was field man or field switchman. The crew went on duty at 3:45 p. m. on the date Oscar R. Burnett met his death and it was around six p. m. that the body of Oscar R. Burnett was found.

The railroad yard involved in this case is located in Dothan, Alabama, between La-Fayette Street on the north and Selma Street on the south. It consists of a main line and five switching tracks. A diagram of the general location of these tracks was introduced in evidence and we have this exhibit before us for examination. The main line of the defendant crosses La-Fayette Street and continues in a curve in a general southerly direction across Selma Street. Immediately west of the main line or roughly parallel to it is No. 1 track. It connects with a lead track which comes off the main line just north of Selma Street and which rejoins the main line just south of LaFayette Street. Immediately west of No. 1 track is No. 2 track. Immediately west of No. 2 track is No. 3 track and immediately west of No. 3 track are tracks Nos. 4 and 5, the latter being the lead track which has been referred to. There are switches from the lead track to these various tracks. All of these tracks, namely 1, 2, 3, 4 and 5, lie west of the main track. The level of the tracks is slightly downgrade from the south to the north.

The body of Oscar R. Burnett was found just inside the east rail of track No. 1, about 9½ rail lengths south of mile post 81. According to the diagram which we have before us and which was introduced in evidence, mile post 81 is at a point about midway of the distance between the point where the lead track branches off from the main line at Selma Street and the point where it returns to the main line south of LaFayette Street. The body lay beneath a box car. It was closer to the east rail with the head to the north and with the left arm and left leg severed. His body lay almost against the left rail. His left arm and left leg were outside the rail. His forehead was lacerated and the left side of his chest was crushed inward. There were scuff marks south of where the body was lying approximately 10 or 12 feet. There was flesh three feet south of his feet. According to the undertaker who came to the scene promptly from the funeral home, the scuff marks which were 6 or 7 feet in length began toward the west rail and stopped near where the body was. The shattered eye glasses of the deceased were found by his body and there was blood about five feet south of where it lay.

When the crew reported for work the first chore which they performed that aft-

ernoon was to assist a Central of Georgia switch crew in pulling a cut of cars into the Dothan yard of the defendant. The defendant's diesel switch engine coupled to the Central of Georgia cut and helped it along, cutting off from it about at LaFayette Street. These cars in this cut were being delivered by the Central of Georgia to the defendant. The Central of Georgia switch engine put them in track No. 5.

The second chore performed by the switch crew of the defendant was to go back on the main line across LaFayette Street to the "transfer" of the Atlantic Coast Line, where that railroad delivered cars to the defendant. On this first trip to the Atlantic Coast Line "transfer" the crew picked up 50 or 55 cars, pulling them down the main line to clear the Selma Street crossing.. The diesel engine then cut loose from this string of 50 or 55 cars and went back to the Atlantic Coast Line Transfer, utilizing track No. 3 for that purpose. On this second trip to the "transfer" the diesel engine picked up about 30 cars and pulled them into track No. 3. There were thus cuts of cars from the Central of Georgia in track No. 5 and from the Atlantic Coast Line in track No. 3 and on the main line. Tendencies of the evidence showed that Oscar R. Burnett had certain duties with respect to the Central of Georgia cut in No. 5, while the rest of the crew went to the Atlantic Coast Line "transfer" and fetched the two cuts which they left on the main line and in track No. 3. These duties were to bleed the air (thereby releasing the air brakes), check the cars and mark the destination of each from a list with which he had been supplied. He had the same duties with respect to the cars in the Atlantic Coast Line cut on the main line and those in track No. 3.

Then began the job of classifying or building the train. Track No. 1 was utilized for this purpose. The paper empties were cut in first. They were to be used by Southern Kraft Company in Panama City to load paper. They were put down at the north end of track No. 1. Then came the box cars. Then followed the freight cars with wood loaded on them and then

would come the Southern Kraft "miscellaneous stuff". The destination of these several cars in the train thus being built was the Southern Kraft Company in Panama City, with the cars destined for points between Dothan and Panama City being put south of those already mentioned. The switch engine went back and forth, to and from the various cuts in doing this work of "classifying" the cars. Short cuts would be made of them putting the box cut in No. 1, the flat cut in No. 2, etc., preparatory to building the train in track No. 1. The cuts of cars were put in the various tracks by "kicking" them into such tracks. This process, as explained by Baggett, the engineer, was to have the engine couple to a cut, get up sufficient momentum and then disconnect from the cut, allowing it to roll free, the switches being adjusted to allow it to move into the intended track.

The duties of the deceased after bleeding the air, checking and marking the destination of each of the cars contained in each of the preliminary cuts on tracks Nos. 5, 3 and the main line are stated by the engineer Baggett. Baggett said that he last saw the deceased while he, Baggett, was down near the No. 1 switch in the south end of the yard, it then being about 30 to 35 minutes prior to the discovery of the body. Baggett said that Burnett, the deceased, came up to him apparently from track No. 1 or the main line and set out toward track No. 3. The following colloquy occurred:

"Q. Now, then, in the performance of his duties as field switchman, on that occasion, after he finished checking those cars on Number Three track, what would have been his next duties to perform? A. He would have checked the couplings and counted the cars in Number One and Two tracks.

"Q. He would have checked the couplings and counted the cars in Number One and Two Tracks? A. Yes, sir.

"Q. Now, when you say, he would check the couplings, what do you meant? A. He would examine the cars as he walked by and see if they were

coupled. The couplings were made on them.

"Q. Fastened together? A. Yes, sir.

"Q. Would his job require him or call for him to do any particular thing or perform any act if he found a car not coupled together? A. Well, he opened the knuckles on them when he found them closed.

"Q. He opened the knuckles? A. When they were jammed together.

"Q. A coupling has knuckles, does it not? A. That's right.

"Q. And you fit one against the other and they lock? A. That's right.

"Q. When you say open, what do you have to do to open a knuckle? A. You have to lift the lift lever and pull the knuckle out with one hand. You pull the lift lever with the other hand.

"Q. What does pulling the lift lever do? A. Opens the knuckle.

"Q. Opens the knuckle. Then you pull it out with the other hand? A. Yes, sir.

"Q. Is that knuckle located in the drawhead of the car, I believe that is what you call it, located in the end of the car, in the center? A. Yes, sir.

"Q. About how wide is the average railroad car, box car, from side to side? A. I don't know, I guess it would be six feet wide or seven.

"Q. This drawhead would be located in the center? A. About the center.

"Q. After you last saw Mr. Burnett go down Number Three, were any cars kicked into Number One Track by your switch engine? A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. When he finished checking the cars on Number Three track, what would his duties as field man have required him to do on that occasion? A. He would check all the couplings but he would check Number One and Number Two track first, because

that is where we build the first south bound freight train.

"Q. In other words, you were building a train on Number One? A. Yes, sir."

According to conductor Baggett after the deceased disappeared from his view going in the direction of Track No. 3, the other members of the crew began to work the main line until only ten cars remained there. They were two tank cars and a string of flats. Baggett said: "I set the two tank cars over in one of the tracks in the yard and held a string of flat cars coupled up in Number One."

So after Burnett left Baggett's view about 5:30 p. m., Baggett worked the main line, classifying and putting in the various tracks the cars fetched there earlier that afternoon from the Atlantic Coast Line transfer. Baggett got down to the last ten cars, two of them being tank cars. These he set aside and holding on to the other eight, a string of flat cars, he pushed into No. 1 and coupled to the south end of the cars which had been dropped into that track at various times earlier in the afternoon.

Baggett, the conductor, did not at that time know where the deceased was or whether he had finished his chores in track No. 3. We set out the following questions propounded to him and his answers.

"Q. Mr. Baggett, do you know whether Mr. Burnett had finished, or did you know at that time where the deceased was or whether he had finished checking on Number Three? A. No, sir, I did not know."

Again the record shows as follows:

"Q. You say you gave some order to Mr. Causey? A. Yes, sir.

"Q. And that was to make some coupling back north here on Number One track? A. North end of Number One track.

"Q. What was the occasion, please sir, of sending Mr. Causey back to make that coupling? A. Well, we didn't know whether Mr. Burnett had finished checking the other cars over

·in the other yard, or where he was. We didn't know whether he had time to finish checking Number Three.

"Q. Could you see Mr. Burnett at that time? A. No, sir, I couldn't see him.

"Q. At the time you moved your engine and cars back on Number One Track, did you know where Mr. Burnett was? A. No, sir.

"Q. Did you see him? A. No, sir."

Contrary to the testimony of Conductor Baggett, who testified as previously related, it was necessary to step between the cars to prepare the coupling to couple, pulling the lift lever with one hand and opening the knuckle with the other. Switchman Causey testified that it was not necessary to go between the cars to open the knuckle, although he had previously stated, "you pull the lever with one hand and open the knuckle with the other."

No one saw Burnett killed. No one saw from what side of track No. 1 he was working just prior to his death although the record contains the following from the cross examination of Conductor Baggett.

"Q. In working Track Number One, and Number Two, Mr. Baggett, where was it Mr. Burnett's duty to work in between the tracks or on the east side of Number One? A. Well, it has been a general practice to work in between One and Two.

"Q. In the performance of his duties, in between Number One and Two, is that correct? Check tracks Number One and Two? A. Yes, sir.

"Q. And his body, at the point it was found, was closest to the east rail, on the east side of track Number One? A. Laying on Track One, inside."

On redirect examination the following occurred:

"Q. There was no established practice about which side a man would check couplings from, whether it was from the east side or the west side of the track? A. There wasn't any requirement on that but ordinarily he would come up between One and Two, see?

"Q. Had you seen him prior to that time checking on the other side? A. No."

Finally, it should be mentioned that on direct examination of Conductor Baggett the following occurred.

"Q. On that date, in kicking cars from the south toward the north, into Number One track, did you kick any cars into Number One track on that day? A. Yes, sir."

■ In Louisville & Nashville Railroad Co. v. Steel, 257 Ala. 474, 59 So.2d 664, 667, we pointed out that in cases brought under the Federal Employers' Liability Act, this court is controlled by the decisions of the Supreme Court of the United States. In that case we said: "The Supreme Court of the United States has decided that the trial court is not justified in taking the case from the jury and directing a verdict for the defendant except where there is a complete absence of probative facts to support the plaintiff's claim of negligence on the part of the railroad."

■ There were no eye witnesses to the death of Oscar Burnett. Without doubt, however, actionable negligence may be established by circumstantial evidence. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. Furthermore, as in this case, where the affirmative charge was refused the defendant, the entire evidence must be viewed in its most favorable aspect to the plaintiff and where this is done and a reasonable inference may be drawn adverse to the party requesting the affirmative charge, such charge is properly refused. Sullivan v. Alabama Power Co., 246 Ala. 262, 20 So.2d 224; Alabama Power Co. v. Buck, 250 Ala. 618, 35 So.2d 355.

The proof showed that three cuts of cars, one from the Central of Georgia and two from the Atlantic Coast Line Railroad, were placed, respectively, on Track No. 5,

the main line, and on Track No. 3. The deceased had duties to perform with respect to each. These duties were to bleed the air from, check and mark the destination of each car from a list with which he had been supplied for that purpose. This work the deceased did, before the actual work of classifying or building the train on track No. 1 began. After finishing this preliminary work on the three cuts, the deceased had other and separate duties to perform with respect to the train then in the course of being built on track No. 1. These cars had been placed on track No. 1 in piecemeal and in the order of their "classification". The cars were "kicked" into track No. 1, not together, but one or more at a time as they were picked up at various points throughout the yard.

It was the duty of the deceased to pass down these cars being built into the train on track No. 1, which he had previously seen and checked and mark when they had first arrived at the Dothan yard from the Central of Georgia and Atlantic Coast Line, in order to check the couplings. As he passed down the string of cars some of which were coupled and some of which were not, it was his duty to look between the cars to see if those which were not coupled had the couplings in readiness to be coupled.

Tendencies of the evidence further showed that it was the duty of the deceased, where knuckles between uncoupled cars were not opened, to go between the cars and open the knuckles and he accomplished this by pulling the left pin with one hand and opening the closed knuckles with the other. From the foregoing the jury clearly had the right to infer that the deceased had duties requiring him to be along side the cut on track No. 1, when he was killed.

The foreman Baggett "kicked" cars into track No. 1 while the train was thus being built on track No. 1 and later on pushed eight flats into that track coupling to the south end of the southernmost car. During all of this time, he did not know where the deceased was, although he knew that Burnett's duties called for him to work along the string already in track No. 1 and to ready the cars for coupling where they were not coupled by reaching between them as already related.

We, therefore, are of the opinion that the case presented a case for the jury under the decisions of the Supreme Court of the United States. These decisions are collected in Louisville & Nashville R. Co. v. Steel, supra. One of those cases is Tennant v. Peoria & P. U. R. Co., supra. In that case nobody saw the deceased killed. The Supreme Court of the United States in that case said [321 U.S. 29, 64 S.Ct. 412]:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

But it is argued that since no one saw the deceased when he was killed, it is mere speculation to say that he was killed while in the performance of his duties. In Lavender v. Kurn, supra, no one saw the dead man killed and so the circumstances of his death could not be established by eye witnesses. In that case the deceased threw switches in the Memphis Railroad yard. It was the duty of the deceased employee

to throw the switch. He was found dead near by. The railroad undertook to show that he was murdered and could not have met his death in the manner charged. The Supreme Court held that the case was a case for the jury and among other things said [327 U.S. 645, 66 S.Ct. 744], "It is no answer to say that the jury's verdict involved speculation and conjecture." See also Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497.

Upon a careful consideration we conclude that the judgment of the lower court should be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.