73 So.2d 85

**ATLANTIC COAST LINE R. CO.**

v.

**McMOY.**

6 Div. 632.

Supreme Court of Alabama.

May 20, 1954.

Peyton D. Bibb, Graham, Bibb, Wingo & Foster, Birmingham, for appellant.

68

W. G. Hardwick, Dothan, and Jackson, Rives, Pettus & Peterson, Birmingham, for appellee.

STAKELY, Justice.

This is a suit brought by Mrs. Bertie Mae McMoy, as administratrix of the estate of C. L. McMoy, deceased (appellee), against the Atlantic Coast Line Railroad Company (appellant), under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for the death of her husband C. L. McMoy on July 26, 1952. On the aforesaid date C. L. McMoy was employed as a car inspector by the Atlantic Coast Line Railroad Company, the railroad being engaged at the time in interstate commerce.

The case went to the jury on Counts A, B and C. Each of the aforesaid counts contained averments of engagement in interstate commerce, that C. L. McMoy was employed by the defendant as a car inspector in the Dothan Yards of the railroad and that he was run over and killed by the wheels of a railroad car in the aforesaid yards on July 26, 1952. In addition to the foregoing allegations Count A charged liability on the part of the defendant for negligent failure to use reasonable care to furnish a reasonably safe place to work. Count B charged the defendant with liability for negligently kicking a cut of 14 cars violently against a cut of cars about which the deceased was working as a car inspector. Count C charged the defendant with liability for negligently failing to warn the deceased that the cut

of cars was about to be kicked against the cut of cars about which the deceased was working as a car inspector.

The defendant pleaded in short by consent the general issue and contributory negligence. The verdict of the jury was for $47,500, which was reduced on the motion for a new trial by a remittitur to $30,000. Upon acquiescence in the order of the court on defendant's motion for a new trial, reducing the amount of the verdict and judgment as aforesaid, the motion for a new trial was overruled.

C. L. McMoy, age 52, worked for a number of years for the Atlantic Coast Line Railroad Company. He was a car inspector until the time of his death on July 26, 1952. His duties involved the physical inspection of cars, including inspection of safety appliances or brakes, qualifying cars as to the type of commodity for which they were suited, coupling of air hoses on cuts made up for outbound movements, inspection of through trains, cuts of cars picked up by through trains in the yards and cuts of cars set out in the yards by through trains.

On the day of his death McMoy reported for work at 4:00 o'clock P. M. and was to have completed his work at 12:00 o'clock midnight. One of the through trains which regularly came through at this period was No. 213. McMoy was to work this train and the cars it picked up to take out of the yards. This duty included a test of the train brakes after it was ready to go and to be cleared out and then to inspect the cuts of cars brought in by the through trains left in the yard. After having completed the work on No. 213, his next duty was to work or inspect the cut of cars being made up to go out on the next later train, No. 216.

Train No. 213 came into the yards about 9:20 P.M. At that time McMoy was talking with F. W. Green, yard foreman of the yard switch crew handling the cars in the yard that night, about the work to be done. The foreman advised McMoy of the immediate approach of Train No. 213 and of the cars to be picked up by that train in Dothan. McMoy then asked the switch foreman about the cars to be picked up by the next train, No. 216. The switch foreman told McMoy that the pickup for No. 216 would be made up on Track No. 5, on which a number of cars for that pickup were located. McMoy then asked how soon the foreman would complete making up the pickup for No. 216 and the switch foreman told McMoy that he did not know as he had several more switches to make on it. McMoy said: "All right." Train No. 213 then arrived. No. 213 set off 38 cars and picked up two cars. The switch foreman saw McMoy walk around No. 213 and saw McMoy give the usual inspector's brake test signal with his light to the engineer of No. 213, to which signal the engineer responded. This was approximately 9:55 P.M.

Thereafter no one saw McMoy until his body was found by yard clerk, G. B. Stokes, at about 10:25 P. M. that night, at a point between Tracks No. 5 and No. 6, and at a point about 1291 feet west of the west end of the engine shed in the Dothan Yards.

All the witnesses testified that the place of the accident was dark, that this area had never been lighted and that there were no electric lights down there. There were no lights in the yard west of the engine shed in the direction where McMoy was working for a distance of 1200 to 1300 feet.

At the time McMoy was found he was unconscious and apparently dead. There were indications that at the time he was checking the 216 pickup. After going a short distance Stokes saw a light, a switchman's lantern, about 8 cars away. It was sitting to the left of the path between tracks 5 and 6 and thus closer to 5. The lantern was sitting straight up just as one would "set one down." As Stokes tells it, just as he was beginning "to wonder where the Car Inspector was, I saw him in the shadows, his head facing east and his feet west at an angle."

McMoy's right hip had been crushed through the groin and his left leg had been severed at the ankle. Inspection disclosed a

substantial amount of blood on the north rail about 17 feet east of his body, a lesser amount of blood on the rail about 24 feet east of his body, and there were markings on the ground between the rails indicating that something had been dragged under the car for a distance of approximately 28 feet. The indications were that the third car from the west end of the cut standing on track No. 5 and beside which his body was found, had run over him.

Stokes also testified that directly opposite where the lantern was sitting so as to be in its ray and between the rails of track No. 5, he observed a pile of gravel. In general appearance it was loose gravel and in it were one or two footprints, which Stokes remembered as being "sunken in kind of like, in other words like he braced himself." Stokes described the position a man usually adopts to couple the air hose. He said, "Generally they step in like this and bend over and take the hose with their hands and put them together and they lock in place. * * * They do this with one foot across the rail and one outside." Other witnesses also remembered the impression in the gravel.

The customary manner of connecting the air hose was described by the witness Morrison as follows: "You walk in this way and step over the rail with this foot and reach down and get the hose on the far side and couple them together just like that." He pointed out that one foot is kept on the outside of the rail, while they are doing this work, connecting the hoses, which are uniformly placed on all cars. The following questions were propounded to the witness Morrison, to which he gave the following answers:

"Q. I will ask you this question: Suppose you are working on a cut of cars, we will say is 12 cars long and you were working between the 10th and 11th car coupling the air like you described you did it, and on the far end of that cut of cars another cut of cars is connected to it at a speed of about 3 miles an hour, do you hear that car hit from where you are work-ing between the 10th and 11th car? A. Can you hear it hit?

"Q. Yes. A. Yes, sir, you can."

The Court then asked the witness the following question to which he gave the following answer.

"Q. The Court: Of course, it may be true that one man may react more readily than another. Let me ask him this: About how long would you hear such a blow such as that between the 10th and 11th car, before the car nearest you would move?

"The Witness: In my judgment, it would be one or two seconds."

In the same connection the defendant's witness, Car Inspector Hall, on cross-examination testified as follows:

"Q. Mr. Hall, how long does it normally take a Car Inspector to couple an air hose? A. An air hose?

"Q. Yes. A. Just a breath. You just pop it right together if you know how.

"Q. So the normal length of time you are between two cars you say is just a breath? A. Yes, sir, by the time you get in you are coming back out."

J. B. Johnson, a witness for the defendant testified in part in substance as follows: In July of 1952, when McMoy was killed, he was working as a switchman. He was the pin man in the switching crew building the pickup of 216 in track No. 5. Of them, the first or lower 9 were empty gondolas. Cars 10 and 11 were climax cars. No. 10 was loaded with coal and No. 11 was pulpwood. They were collected from tracks Nos. 2, 3 and 6 and dropped into track No. 5 around six or seven P. M. After supper, about 8:55 P. M., the 12th car, a car of lumber, was weighed and dropped into track No. 5, coupling to the cut of 11 cars already there.

As appears from the answers to the statutory interrogatories the building of pickup No. 216 was interrupted by the

arrival of Train No. 213 at 9:25 P.M. The yard or switch engine went down into the old Main Line through the yard and when it got opposite the cut of 12 cars then standing on Track No. 5, Switchman Johnson got down from the engine and set the hand brakes on the west or bottom car in the cut.

On cross-examination Johnson described his act of setting this hand brake. He didn't remember its type, but he remembered it was a wheel brake and he testified that he set the brake up tight.

After working Train 213, taking out the cars that were to be left at Dothan and putting in the two cars that were to depart from that point, the switch crew resumed the building of the pickup for 216 in Track No. 5, going back to work about 9:40 or 9:45. They got 14 cars together and began to move them over from Track No. 7 to put them into Track No. 5.

Johnson, the pin man, gave the signals and pulled the pin in connection with this movement.

It was this particular movement—that is, the propulsion of this cut of 14 cars down onto the 12 cars already standing in Track No. 5—which it is claimed killed McMoy. When the draft of the 14 cars was completed Johnson gave a signal with his light to the engineer, and he got up on the cut as it was pulling out of Track No. 7, boarding either the 6th or 7th car from the engine. He rode it to Track No. 5, where he dropped off. When the bottom car in the string of 14 cleared the switch into Track No. 5, Johnson gave the signal to the engineer to stop. Then he threw the switch to No. 5, and signalled to come ahead. The train was moving 2 or 3 miles per hour, he said, when the east end or top car got opposite Johnson. He pulled the pin after signalling for a little slack and the cut of 14 rolled free down Track No. 5 and against the 12 cars already there.

There was nothing in the aisle way between Track No. 6 and Track No. 5 to obstruct Johnson's view. The ground was level and the tracks were straight.

Johnson testified that he saw no light down there between these two tracks prior to the time that he began to signal to make the move.

The testimony for the defendant showed that for many years prior to July 26, 1952, the date of the accident, the Atlantic Coast Line Railroad Company had a safety rule, being Rule No. 26, and generally known as the Blue Signal Rule. In substance the rule provides that a blue signal displayed at one or both ends of the engine, car or train, indicates that workmen are under or about the engine, car or train. When thus protected, the engine, car or train must not be coupled to or moved. Each class of workmen will display the blue signal and the same workmen are alone authorized to move them. Other equipment must not be placed on the track so as to intercept the view of the blue signals without first notifying the workmen. When emergency repair work is to be done under or about cars in a train, and a blue signal is not available, the engineman or fireman will be notified and protection must be given persons engaged in making the repairs. The Blue Signal Rule requires the use of a blue flag by day and a lighted blue lantern by night.

It is undisputed that in this case McMoy did not put up a blue light on the cut of cars before he went between the cars as is required by Rule 26.

There was a conflict, however, in the testimony as to whether Rule 26, the Blue Signal Rule, was or was not obeyed. The testimony of witnesses for the plaintiff and who had been employed in the Dothan Yards where the accident occurred, tended to show that the only time that Blue Signals were put out was when a car was broken down or derailed and when the rigging was broken down. According to their testimony, it was the practice of everyone in the yards to disregard the rule. There was testimony tending to show that disregard of the rule had occurred in the presence of officials of the company. There was also testimony of witnesses employed by the defendant that the rules were strictly observed.

There was also conflict in the evidence as to what would occur when a cut of 12 cars with the brake set on the bottom car was hit by another cut of cars 14 in number, traveling at various speeds. This phase of the evidence will be discussed later.

 Error is predicated on the refusal of the court to give the general affirmative charge with hypothesis. It is well understood that actionable negligence may be established by circumstantial evidence. Atlantic Coast Line R. Co. v. Taylor, Ala.Sup., 71 So.2d 271[1]; Atlanta & St. Andrews Bay Ry. Co. v. Burnett, 259 Ala. 688, 68 So.2d 726; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. Furthermore, where the affirmative charge was refused the defendant, the entire evidence must be viewed in its most favorable aspect to the plaintiff and where this is done and a reasonable inference may be drawn adverse to the party requesting the affirmative charge, such charge is properly refused. Atlantic Coast Line R. Co. v. Taylor, supra, and cases cited therein. Furthermore this court must follow the interpretation put upon the Federal Employers' Liability Act by the Supreme Court of the United States and that court has held that it is no answer to say that the jury's verdict involved speculation and conjecture. This court in keeping with decisions of the Supreme Court of the United States, has held in Atlantic Coast Line R. Co. v. Taylor, supra, and Atlanta & St. Andrews Bay Ry. Co. v. Burnett, supra, and Louisville & N. R. Co. v. Steel, 257 Ala. 474, 59 So.2d 664, that the affirmative charge is properly given only when there is a complete absence of probative facts to support the plaintiff's claim of negligence on the part of the railroad.

Count A of the complaint alleges a negligent failure on the part of the defendant to use reasonable care to furnish the plaintiff a reasonably safe place to work. It is unquestioned that the place where McMoy was working at the time of his death was dark. The nearest light was 1200 to 1300 feet away on the side of the engine shed. If there had been sufficient light where he was working, he might have seen the approaching danger and leaped to safety or he might have been observed by Johnson, the pin man riding on the front of the train that hit the cut of cars McMoy was working on, or he might have been seen by the engineer, who was working on the train that hit the cut of cars on which McMoy was working. In Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, it was held a question for the jury as to whether or not the light was so insufficient as to make the work unsafe.

Counts B and C in substance claim that the death of McMoy was the proximate result of the action of the defendant in negligently kicking the cars into the cut of cars on which McMoy was working. Tendencies of evidence showed that there were markings on the ground indicating that the body of McMoy had been dragged under the cars for a distance of approximately 28 feet. McMoy's body was found by Stokes outside the rails of track No. 5. Stokes estimated that the body was 30 feet from the point where McMoy's switchman's lantern was and also from where the imprint in the loose gravel was. Tendencies of the evidence show that the lower or west end of the cut of 14 cars struck the upper or east end of 12 cars, which were standing on track No. 5, the 12 cars being driven at least 30 feet to the west. The grade of track there was almost level and according to tendencies of the evidence insufficient to cause a car to roll to the west if it were stopped and left with the brakes on. According to the witness Johnson, the brake was set up on the bottom of the 12th car.

There was a rule in the Dothan Yards that couplings should not be made at speeds exceeding 4 miles per hour. The testimony of witnesses tends to show that under the physical facts the cars driven to the stationary cars were driven at a speed of from 2 miles an hour to 20 miles an hour. There was no error in refusing the general affirmative charge with hypothesis.

1. 260 Ala. 401.

Nor was there error in refusing the peremptory charges requested by the defendant as to Counts A, B and C.

■ There was no error in refusing to give either Charge 25 or Charge 26 for the defendant. There was testimony in the case tending to show that the Blue Signal Rule was disregarded in the Dothan Yards with the acquiescence of officials of the company and, therefore, that the rule had ceased to have any force or effect. Despite this evidence the two charges assume that the rule was in force and effect and binding on McMoy. Besides, the substance of charges 25 and 26 was adequately covered by the court's oral charge to which there were no exceptions.

■ There was no error in refusing to grant the motion for a new trial on the ground that the verdict was contrary to the great weight of the evidence. We have said that where there is some evidence to support the verdict, "the decision of the trial court, refusing to grant a new trial on the ground of the insufficiency of the evidence, or that the verdict is contrary to the evidence, will not be reversed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust." Cobb v. Malone, 92 Ala. 630, 9 So. 738, 740; Atlantic Coast Line R. Co. v. Taylor, supra; National Biscuit Co. v. Wilson, 256 Ala. 241, 54 So.2d 492.

■ The verdict of the jury was for $47,500. This amount was reduced by the court, as we have shown above, to the sum of $30,000. It is argued by the appellant that the sum of $30,000 is excessive. Mr. McMoy was born on August 9, 1899. His expectancy as of the date of the trial, which was May 12, 1953, was 16.72 years, with occupational adjustment, according to the evidence. Mrs. McMoy was born on July 25, 1895. She is the sole dependent of the deceased. Her expectancy as a housewife on the date of the trial on May 12, 1953, was 16.09 years. Her expectancy being shorter than his, obviously requires its use rather than that of the husband. Accordingly we deal with an expectation of life in this case attributable to Mrs. McMoy on the trial date of May 12, 1953, of 16.09 years.

■ Her testimony shows that her husband averaged $350 per month of take-home pay, after payment of income tax, relief and railroad retirement. She testified that he contributed on an average to her for her individual support and maintenance of $250 per month. This amount was broken down into various items among which were rent, groceries, electricity for lights and cooking, etc. Mr. McMoy ate and lived at home and thus participated in these household contributions. We feel sure that on the motion for a new trial the various figures were considered by the court when a reduction was ordered in the amount of the verdict.

To obtain an income of $100 per month at 2½% interest over an expectancy of 16.09 years, would require $15,844.71. To obtain an income of $180 per month, a figure which under the evidence appears reasonable, would require $28,519.20. McMoy was killed on July 26, 1952. The case was tried and concluded about nine and two-thirds months after his death. There is, therefore, the additional recoverable element of damages of say a contribution of $180 per month for the nine and two-thirds months intervening between McMoy's death and the trial. This amounts to $1,740. So, loss contributions from death to the trial amounts to $1,740 and loss contributions from trial through the expectancy of Mrs. McMoy amounts to $28,519.20. These amounts total $30,259.20. We think it is obvious that the amount to which the judgment was reduced is not excessive.

But it may be argued that the foregoing reasoning does not take into consideration McMoy's violation of the Blue Signal Rule. This, however, was the defendant's theory of the case. The plaintiff had a contrary theory, which was that the Blue Signal Rule was of no force and effect, and which presented a question for the jury. This issue was resolved in favor of

the plaintiff. It does not appear to us that the verdict as reduced by the trial court can be said to be excessive.

The judgment of the lower court is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.