96 So.2d 186

## U. S. PIPE AND FOUNDRY COMPANY

v.

## George NETTLES.

6 Div. 273.

Court of Appeals of Alabama.

April 2, 1957.

Rehearing Denied May 21, 1957.

White, Bradley, Arant, All & Rose, E. L. All and J. Reese Murray, Jr., Birmingham, for appellant.

Edw. H. Saunders, Bessemer, for appellee.

PRICE, Judge.

Plaintiff brought suit for severance pay under the provisions of a collective bargaining agreement between his union and defendant. The amount sued for was $750. The jury returned a verdict in favor of plaintiff for the sum of $354.48. Defendant appeals.

The collective bargaining agreement involved here was entered into on the 16 day of August, 1948, between the Sloss-Sheffield Steel & Iron Company and Sloss Red Ore Local Union 109 International Union of Mine, Mill and Smelter Workers. In September, 1952, defendant acquired all of the assets of Sloss-Sheffield Steel & Iron Company and succeeded to its rights and obligations under the contract.

The agreement contained these provisions relative to severance pay:

"Section 13—Severance Allowance

"(a) When, in the sole judgment of the Company, it decides to close permanently the mine or discontinue permanently a substantial portion thereof and terminate the employment of individuals, an employee whose employment is terminated either directly or indirectly as a result thereof because he was not entitled to other employ-

ment with the Company shall be entitled to a severance allowance as follows:

| "Continuous Company Service | Weeks of Severance Allowance |
|---|---|
| * * * * * * | * * |
| "5 years but less than 7 years | 6 |
| * * * * * * | * * |

"(b) A week's severance allowance shall be determined in accordance with the provisions for calculation of vacation allowance as set forth elsewhere in this Agreement, and payment shall be made in a lump sum at the time of termination."

The pertinent provisions of the agreement as to calculation for vacation allowance, read:

"Section 5—Vacations

"(a) * * * Continuous employment for the purpose of determining eligibility for a vacation shall mean the receipt of earnings in at least sixty per cent (60%) of the pay periods of the year preceding the qualifying date when the employee has completed one or more years employment.

"(b) The rate of vacation pay of an employee granted a vacation under (a) above shall be based upon his average weekly rate of earnings for the regularly scheduled hours in the four pay periods immediately preceding the beginning of his vacation."

Section 6 relates to seniority, and provides:

"Section 6—Seniority

"It is agreed to observe during the life of this contract the same practices and customs in regard to the promotion or increases and decreases in the working forces as have been practiced in the past and defined as follows:

* * * * * *

"(b) Lay-offs and return to work of employees laid off; The following factors shall be considered and where factor (2) is relatively equal, factor (1) shall govern:

"(1) Continuous service.

"(2) Ability to perform the work."

Section 6, as to seniority, set out above, was amended on July 17, 1952, as follows:

"(c) Employees laid off at either Ruffner or Sloss shall have preference of available work at the other plant where he is qualified to perform such work.

"(d) The Mine Committee shall be informed of such job openings and of the names of the men affected by layoffs or promotions."

The cause was submitted to the jury under Count A of the complaint and defendant's plea of the general issue in short by consent.

The plaintiff set out in Count A the entire contract between the parties, averred that he was employed by the Sloss-Sheffield Steel & Iron Company on January 31, 1946, and worked continuously for said company and its successor, defendant company, until November 21, 1952, as a common laborer, timber man helper, timber man, and last worked for defendant from the month of September, 1952, until November 21, 1952, as a mucker at a daily wage rate of $13.85 per day, and alleged:

"Plaintiff further avers that although he has complied with all the provisions of said written contract or written agreement as amended on his part, the defendant has failed to comply with the provisions thereof, viz.: that on towit: November 21, 1952 the defendant did decide to discontinue permanently a substantial portion of Sloss Red Ore Mines Number 2 and did discontinue permanently a substantion (sic) portion of Sloss Red Ore Mine Number 2, and as a direct or indirect result thereof the plaintiff's employment was terminated and he was not entitled to other employment with the defendant, and the defendant failed or refused to pay plaintiff his severance allow-

ance or severance pay in the sum of Seven Hundred Fifty & no/100 ($750.00) Dollars.

"Plaintiff further avers that on, towit: the 21st day of November, 1952 when the defendant discontinued permanently a substantial portion of Sloss Red Ore Mines Number 2 that the plaintiff on said date had worked continuously for the defendant from towit: the 31st day of January, 1946 until towit: the 21st day of November, 1952 and had had continuous employment with the defendant or its predecessor corporation of 5 years and 10 months on, towit: the 21st day of November, 1952 when the defendant discontinued permanently a substantial portion of Sloss Red Ore Mines Number 2 and his employment was terminated either directly or indirectly as a result thereof and that plaintiff on said date was not entitled to other employment with the defendant under the terms or provisions of said contract or said written agreement as amended hereinabove referred to due to his lack of continuous service or seniority. And the plaintiff avers that under the terms or provisions of said written contract or said written agreement dated the 16th day of August, 1948 as amended the plaintiff was due the sum of Seven Hundred Fifty & no/100 Dollars, ($750.00) as his severance allowance together with interest thereon from, towit: the 21st day of November, 1952, based upon the average weekly rate of earnings for the regular schedule hours in the four pay periods immediately preceding the beginning of plaintiff's vacation."

■ Dismissal compensation, often referred to as "severance pay" is usually associated with a termination of the employment relationship for reasons primarily beyond the control of the employee, and may spring (1) from an agreement directly between the employer and the individual employee, or (2) from a collective labor contract covering all or a number of employees. See note 40 A.L.R.2d 1045.

It is plaintiff's contention that his employment was terminated within the mean-

ing of Section 13 of the contract, and it is defendant's contention that plaintiff's employment was not terminated, but that he was merely a "laid off" employee subject to recall and other employment rights dependent upon "seniority" as defined in the agreement.

The assignments of error relied upon for reversal by defendant on this appeal are: (2) Refusal of the requested general affirmative charge.

6. Refusal of the trial court to give requested charge "15."

9. Refusal of the trial court to give requested charge "22."

10. The court's action in overruling defendant's motion for a new trial grounds for which insisted upon here are: (1) the verdict of the jury is contrary to the great preponderance of the evidence; and (2) that the verdict is contrary to the law of the case as given to the jury in its oral charge and in the written charges given by the court at the request of the defendant.

It is undisputed that Sloss-Sheffield Steel & Iron Company merged into and became a part of United States Pipe and Foundry Company in September, 1952, and defendant assumed all obligations and succeeded to all the assets of Sloss-Sheffield Steel & Iron Company, including rights and obligations under the contract with Local 109 of International Union of Mine, Mill & Smelter Workers; that plaintiff was a member in good standing of said International Union of Mine, Mill & Smelter Workers, and Local 109, and that defendant deducted union dues from plaintiff's pay, and paid same to the union; that said union was the exclusive bargaining agent for employees of Sloss No. 2 Mine. Plaintiff became an employee of defendant's predecessor on January 31, 1946, and worked continuously as a laborer in the mines until November 21, 1952.

It is also without dispute that the Sloss Red Ore Mine No. 2 opened in 1890, and,

as was the general custom and practice in the mining industry, removed 60% of the ore as it went forward in first mining operations and left 40% of the ore in the form of pillars, for the protection of the top, to be removed in second mining or robbing operations; that in 1929 some second mining had taken place and in 1938, 1941 and 1942 appellant began removing the 40% of the ore in second mining operations at various places throughout the mine.

The first evidence offered was the plaintiff's interrogatories to the defendant and the defendant's answers thereto. In its answers defendant stated that plaintiff was laid-off on November 21, 1952, but that he has never been discharged or his employment terminated; that the mine was not shut down.

Defendant answered further that by 1941 and 1942 it had reached the end of its property line and could no longer go forward by extending its shafts; that headings were being extended to property lines as late as 1954; that it could no longer go forward by opening up new slopes after 1954.

To interrogatory No. 39: "State to what extent or what portion of Sloss No. 2 Mines operations had ceased or been abandoned permanently on, towit: November, 1952," the defendant replied:

"Second mining or removing the ore left during first mining had been completed in November, 1952, in approximately ⅓ of the mines." And to interrogatory 41, the defendant said:

"The best answer defendant can give to this is that about ⅓ of the mine had been second mined and ore fully recovered therefrom in November, 1951. (b) About 200 to 250 acres out of 700–800 acres have been second mined."

Defendant also stated in answer to interrogatories that "All coal mined in what was once known as Sloss No. 1 and No. 2 mines is now mined and removed through No. 2 mine," and, "As stated above, about ⅓ of the area of the mine had been mined out and the ore fully recovered therefrom in November, 1952." This refers to the total area of what formerly was known as No. 1 and No. 2 mines.

Plaintiff's first witness, Lloyd N. Miller, an employee of the State Employment Service, Bessemer office, identified Form BEN–241, "Request for Separation Information" concerning Exhibit 3, executed by defendant, set out in item 10 the employer's statement as follows: "The individual named hereon was separated from our employ on 11–21–52, for the following reason: No work available." On cross-examination the witness testified Form BEN–241 is prepared and sent out by the State and the words "separated" and "no work available" are used in all circumstances, regardless of whether the lay-off is temporary or permanent.

Plaintiff's next witness, Alton A. Lawrence, an employee of plaintiff's union, identified the collective bargaining agreement and the amendments thereto. The contract was offered in evidence as plaintiff's Exhibit 4. The amendments were offered as Exhibits 5, 6, 7, 8, 9 and 10. The witness stated the severance pay clause of the contract was first granted in 1948, and has been a part of the contract since that date.

Dave E. Smith testified he is now the pastor of a church, but that prior to becoming a minister he worked at Sloss mine for defendant or its predecessor more than 25 year, from July 6, 1926, until April 8, 1952. He had worked as a laborer, miner, operator of mining machinery, maintenance department, assistant mine foreman, safety inspector, mine foreman, and had operated drags and hoists. He had also had two years in vocational school of mining at the University of Alabama.

This witness testified the Sloss mines covered two sections of land with 640 acres per section. He described in detail the workings of the mines. A map of the underground workings of Sloss mines was

identified and explained and introduced in evidence as plaintiff's Exhibit 11. The witness stated operations in the original No. 1 slope were terminated in 1929; that all the mine represented by the red colored portion of the map, excepting a very small area, had been second mined by April, 1952; that that portion had been abandoned, its timbers and pillars shot out, releasing the top, which had fallen in; that at the time he left in April 1952, about 35 per cent of the entire mineable properties had been completely mined out; that about 65% of the mines remained to be second mined; that in the 65 per cent of the total properties remaining, the 40 per cent of the ore left as pillars represented about 26 per cent of the entire amount of ore that was in the property to begin with.

On cross-examination the witness drew two rings around small parts of the red portion of the map that had not been second mined when he left in April, 1952; that portion in red which had not been worked out was the "78 rock, Harry Smith Stope;" there was only one stope. The stopes usually turn 75 foot centers and are driven 250 to 300 feet back; that 30 per cent of the red ore, which would be about $9/7$ of it, had been worked out by 1950, and $1/7$ of the red portion was mined out between 1950 and 1952; that that part of the mine is abandoned on second mining by throwing it in behind, which is a gradual, but not a day by day, process. Sometimes there is more than a day's work to throw in behind it. "Sometimes you have a month. Sometimes you have as much as six months work to throw in at one time behind you."

The witness testified when he left defendant's employ the plaintiff was still there and they were working on the property marked in yellow on the map.

Defendant introduced Exhibit A, marked map No. 2, which was identical to plaintiff's Exhibit 11, marked "Map No. 1."

The witness marked on map No. 1 certain areas along the property barrier that had fallen in. He further stated that a certain section of the mine was inaccessible because of a reservoir and a water breakthrough. The witness also indicated a rock tunnel and marked areas in the white portion of the map, in his judgment it was "uneconomical or not feasible" to mine the ore.

James D. Johnston, plaintiff's next witness, testified that he is plant accountant for defendant; that plaintiff was given pay for two weeks vacation in February of 1952, at a rate of about $59.08 a week, and that plaintiff left the employ of the company November 21, 1952, and has not worked there since.

The plaintiff testified that he was living at Sloss number 2 Camp; that he had worked for the Sloss company and the United States Pipe and Foundry Company from January 29, 1946 and that the last day he worked was November 21, 1952; that roughly he had six years and eight months time with defendant; that he was a member of the International Union Mine, Mill and Smelter Workers and Sloss Red Ore Local No. 109 and paid his dues up to the last day he worked; that his vacation pay for the year 1952 was $59.08 per week; that he did not know the boundaries of the mine nor how much of the mine had fallen or been abandoned; that he worked with the production and maintenance crew on the night shift; that about 38 men were laid off at the time he was laid off; that a notice, signed by Mr. Russell, the Superintendent, stating that, "These the following men be terminated, then had the list of names down under there, 38," was posted on the bulletin board near the side window of the company's office; that his name was on the list and he had not worked since that date.

Jesse Gaines, a member of the grievance committee of Local No. 9, testified that a day or two prior to the last day plaintiff worked for defendant he saw the notice posted on the bulletin board. The notice stated that effective November 21, 1952, the following men would be terminated, naming them. Witness, as a member of the grievance committee for the union, called on Mr.

Russell to inquire as to the company's attitude concerning severance pay; that Mr. Russell said it was a matter to be handled by the General Superintendent of the mines.

The witness stated that as far as he was concerned "terminated" and "laid off" meant the same thing; meant that he was off the job; that when a man is "laid off" he is subject to be called back, but if he is "terminated" he is going for good; that the company used the word "terminate" on the notice; that the reason the employees were laid off or terminated was because the company decided not to use the night shift; that the company claimed these men didn't have enough work to do to maintain that shift and "we could do it on one shift;" that the general complaint by the company was that they didn't get enough ore on the night shift and that had been the general complaint as to both the night and day shift, that they weren't producing enough ore, regardless of production; that the reason given by the Superintendent was that "these men were being terminated because of the gradual shut down and he had to terminate because there was no work available for them." The company was complaining in March because the day and night shifts were not producing enough ore, but the night shift was not laid off or terminated until November; that Mr. Russell told the committee, "these 38 men were being terminated because of the gradual shut down of the mine, have to be terminated because they didn't have any further employment." When Mr. Smith was foreman of the night shift, there were more than 200 men working on that shift, until June, 1952, when there was a lay-off of the night shift except for a skeleton crew of 38 or 40 men, and they were not mining ore, but were maintenance men, hauling down supplies, steel, rails and things and placing them around for the convenience of the day shift.

Appellant's evidence was presented by Mr. J. W. Nicol, and Mr. Joe Russell. Mr. Nicol, general Superintendent of the mines, stated that the red area of the two maps introduced in evidence represented the portion of the mine in which second mining had been completed by November of 1952; the yellow portion represented that part in which second mining had gone on from November 1952 to 1955; the white portion was that part in which no second mining had been done; that he agreed with plaintiff's witness, Mr. Smith, that the red portion represented 35% of the mine and the white portion represented approximately 65% of the mine; that there was a rock tunnel and a creek in the mine about 800 feet long, which is about two inches on the white portion of the map; that the ore near the creek is not recoverable. The witness stated that in his judgment there was five and a half million tons of ore still in the mine. In Mr. Nicol's words the night shift operation was discontinued, "to improve the performance of the mine" because the night shift had a great many men who "did nothing but haul material in and out, each slope having three men, hoist men and two engineers and we had probably, for instance, nine men that hauled small amount of ore on the night shift, whereas on the day shift they hauled a full shift of ore. Actually the production, as far as the day and night, the night shift was all unbalanced. * * * There were too many dead workmen and haulage men for the amount of tonnage that we ran on that shift;" that the production of the night shift did not justify keeping it as it was. He stated that in keeping with section 6 of the contract provisions respecting seniority the men actually laid off were the lowest men on the night and day shift; that since the discontinuance of the night shift, although not immediately, production has been improved, which he attributed to "improvement in performance of the men" brought about by "changes in the manner of working the equipment and the men." He stated that no part of the mine was abandoned on or just prior to or just after November 21, 1952. The witness stated fur-

ther that the "demand for the ore" determines the output of the mine; that he did not know that plaintiff was "out for good."

Mr. Russell, mine Superintendent, testified that he has had consistently more working places in the mine since November, 1952, than he did before that date and that production is slightly higher. In his judgment there were 6 or 7 million tons of ore left in the mine; that he had no occasion to estimate it, but originally there must have been around 25 million tons. He testified that in November of 1952, the night shift was eliminated. In laying off the men the seniority provision of the contract was followed, that is, the youngest men on the seniority list were the first to be layed off and the oldest men are the first to be taken back. The reason for the lay-off of the night shift was that "it was an inefficient operation" and "we were not satisfied with our production there," according to the number of men employed. He testified that he posted a written notice in two places about the lay-off; that he does not have a copy of the notice but it is his recollection that it was headed up: "The following men would be cut off effective November 21, 1952," followed by a list of the men and their payroll numbers. He stated that the second mining in the red area was completed piece by piece and progressively over a period of years.

Defendant argues that it was entitled to the general affirmative charge in its favor because of the plaintiff's failure to prove the following material allegations of his complaint: (1) that on to wit November 21, 1952, the defendant decided to discontinue permanently a substantial portion of Sloss Red Ore Mines No. 2; (2) that on to wit, November 21, 1952, the defendant did discontinue permanently a substantial portion of its mine; (3) that on November 21, 1952, plaintiff's "employment was terminated;" that on November 21, 1952, he was "not entitled to other employment" with the defendant.

"Substantial means 'belonging to substance; actually existing; real; * * *

not seeming or imaginary; not illusive; real; solid; true; veritable.' Webster's International Dictionary." Elder v. State, 162 Ala. 41, 50 So. 370, 374.

A "substantial part" means the converse of insubstantial or immaterial, and is not a phrase of mathematical precision. Berry v. 34 Irving Place Corp., D. C., 52 F.Supp. 875. The trial judge defined to the jury the expression "substantial portion" as meaning "a material portion, that is not an inconsequential portion."

"Terminate means to end; to close; to complete; to finish." Webster's New International Dictionary."

In Pan American Life Insurance Company v. Garrett, Tex.Civ.App., 199 S.W.2d 819, the phrase "termination of employment" was defined as the complete severance of the relationship of employer and employee.

■ Words used in a written contract, "if unambiguous, will be given their ordinary and generally accepted meaning. Such is the rule, unless the contrary is made to appear in the contract." Fite v. Pearson, 215 Ala. 521, 111 So. 15. See also Standifer v. Inter-Ocean Ins. Co., 37 Ala.App. 393, 69 So.2d 300. As we view this case it clearly falls within the rule.

■ The well-established rule of law governing the giving of the general affirmative charge, and which we think is applicable here, is that unless the facts are undisputed and only one reasonable inference may fairly be drawn therefrom, the controversy presents an issue of fact to be determined by the jury. See 18A. Ala.Dig., Trial, ☞142 for numerous citations of authority.

■ In determining the correctness of the trial court's action in refusing the general charge requested by defendant, the evidence must be considered in its most favorable aspect for the plaintiff. Winfrey v. Witherspoon's, Inc., 260 Ala. 371, 71

So.2d 37; Atlanta & St. Andrews Bay Ry. Co. v. Burnett, 259 Ala. 688, 68 So.2d 726.

We are of the opinion that the evidence and the inferences reasonably to be drawn therefrom presented questions for the jury and that the issues were correctly submitted to it. The request for the affirmative charge was properly denied.

After a careful consideration of the evidence under the principles by which we are governed, Tucker v. Thompson, 263 Ala. 516, 83 So.2d 238, we cannot say that the verdict was contrary to the great preponderance of the evidence, and that the trial court erred in denying the motion for a new trial on that ground.

Other grounds of the motion argued are 7: "The verdict of the jury is contrary to the law of the case as expressed in the oral charge of the court to the jury." 8. "The verdict of the jury is contrary to the law of the case as expressed by the court in written charges given by the court to the jury as requested by the defendant." These grounds are too general to be considered. "The errors of law complained of and in what respect the verdict ignored such legal principles must have been specifically pointed out that the court's attention may be directed to them." Clark v. Austin, 250 Ala. 407, 34 So.2d 683, 684. See also Atlantic Coast Line Railroad Co. v. Burkett, 207 Ala. 344, 92 So. 456.

It is urged in brief that the failure of the proof to conform to the exact dates set out in the complaint entitled the defendant to the general charge. The brief says: "The complaint makes November 21, 1952, a significant and red letter day, by making that day one on which three (3) important events concurred, viz.: (1) the day on which appellant made the decision to discontinue a substantial portion of the mine; (2) the day on which a substantial portion of said mine was actually discontinued pursuant to the decision; and (3) the day on which plaintiff's employment was terminated as a result there-

of so that he was not 'entitled to other employment with the company.' " The defendant insists that, "any decision that was made as to robbing or performing second mining operations was made in 1890 according to the practices and customs of the mining industry, or in 1929, 1938 and 1941–42," and that the only decision made on November 21, 1952, was to lay off a night shift on which the plaintiff was working.

In Nelson v. Cutter Boat & Motor Company, 260 Ala. 648, 72 So.2d 86, the court collected and reviewed many decisions setting up the fundamental rules governing the question of exact proof of a certain date when it is alleged under a videlicet.

It is our opinion that the exact date of appellant's decision to discontinue a substantial portion of the mine is not material to plaintiff's cause of action, and the defendant was not entitled to the general charge for failure of proof to conform to the exact date set down in the complaint.

Under our view, the question to be determined was whether such a decision had been made and acted upon at the time of appellant's alleged "termination," and that his employment was terminated either directly or indirectly as a result thereof, etc., rather than a question of the exact date of the decision to discontinue permanently a substantial portion of the mine.

For the reasons stated in the preceding paragraph we conclude that the court properly refused to give to the jury defendant's requested charge 15. Further, said charge is argumentative in giving undue prominence to portions of the evidence.

It is our opinion that appellant's requested charge 22 was properly refused as argumentative, but even if correct, we think that these excerpts from the court's oral charge, "I charge you that when I used the term 'that the plaintiff's employment was terminated' that I mean by that, that his employment was

indeterminate. To terminate is not the same thing as a temporary lay-off. The expression that his employment was terminated means that his employment was permanently ended, and not that he was temporarily laid off. The word 'terminate' means to end permanently. * * * the plaintiff is required to prove to your reasonable satisfaction that his employment was terminated and that such termination was a direct or indirect result of the permanent discontinuance of a substantial portion of the mine, and if his employment was terminated but was terminated for some other reason, then he is not entitled to a verdict in this case," in connection with charge 7 given at defendant's request, rendered the giving of charge 22 unnecessary. Title 7, Section 273, Code 1940. Defendant's given charge 7 was as follows:

"7. I charge you, Gentlemen of the Jury, that the plaintiff has the burden of proving to your reasonable satisfaction that the cause of his lay off or cut off was the permanent discontinuance of a substantial portion of the mine and you cannot return a verdict in favor of the plaintiff, if he was cut off or laid off for any other reason."

The judgment of the trial court is affirmed.

Affirmed.