No. 31,423

Ben H. Howard, *Appellant*, v. Hartford Accident and Indemnity Company, *Appellee*.

(32 P. 2d 231.)

Opin-
ion filed May 5, 1934.

*Sullivan Lomax* and *J. A. Brady,* both of Cherryvale, for the appellant.

*John Bertenshaw* and *Kirke C. Veeder,* both of Independence, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action for damages.

Plaintiff's petition alleges that on April 21, 1931, he and the defendant entered into an insurance contract, providing that the insurer would indemnify the insured "against loss caused (1) directly and exclusively by bodily injury sustained solely and independently of all other causes through accidental means" and that "if any loss specified in this section shall result directly and exclusively from such injury within ninety (90) days after date of the accident the company will pay," etc., and that, among other things, it was provided that in case of the irrecoverable loss of the sight of one eye the defendant would pay to the plaintiff $1,000; that he is a fireman of the city of Cherryvale, Kan., and on January 12, 1932, while attending to his duties at a certain fire, the contents of a fire extinguisher entered his left eye, which immediately became sore and tender; that he consulted a doctor who did all in his power to cure the eye, but the eye grew worse until on or about February 1, 1932, when he irrecoverably lost the entire sight of his left eye. Demand and refusal were alleged.

Defendant admitted plaintiff's residence and address and the execution of the insurance policy and denied the remainder of the petition.

A trial was had before a jury. Howard testified he had been a fireman since 1931 and was on duty when he, with other firemen, answered a call after dark on January 12, 1932, to put out a fire at the top of a house; the fire extinguisher was started, the fire extinguished and the firemen were coming down the ladder, spray was still issuing from the fire extinguisher which was carried by a fireman above plaintiff, and some of it struck plaintiff's face and particularly in his left eye, that it became very painful and burned him. across the forehead in places; that he. went home and called the chief who told him to use a solution of soda and water, which he did, and then he went to see Doctor Gasser, who used an eye cup and gave

him some medicine to use, which he did; he believed the acid, hereafter referred to, burned some holes in his shirt and coat; went on duty the next day; kept on doctoring the eye; about ten days after the fire the soreness left, but the sight was gone. The fire extinguisher contained soda, water and sulphuric acid and was so constructed that when turned on these mixed and caused a spray to discharge. He lost no time from his work.

Harmon, a fireman, and Jones, the fire chief, both testified about the fire and the use of the fire extinguisher.

Doctor Gasser testified that he treated plaintiff; that on examination he found the eye inflamed, with some marks on it; a few marks around the eyelids that were blistered, and it showed evidence of a chemical burn of some kind. He stated that the sight of the eye was gone, and in his opinion the inflammation in the eyeball was due to the burn received the night of the injury. On cross-examination he stated the lid was burned on the inner side and a square area burned on the white of the eye; that he could not see any burn on the cornea; that an acid would cause a scar on that part of the eye where the burn was. He stated that in his judgment the sight of the eye was irrecoverably lost, and he thought the optic nerve was affected. Doctor Gasser stated he had never done much eye work and he therefore sent plaintiff to Dr. T. E. Smith, a specialist, of Independence.

Doctor Smith was subpœnaed by the plaintiff, but was not called by him. He was called as a witness by the defendant. On objection by plaintiff that his statements were privileged, he was not permitted to testify as to results of his examination. He was qualified as an expert and testified as to the chemical effect of mixing soda, sulphuric acid and water; that a reaction occurs between all acids and alkalies when they are brought in contact; one neutralizes the other; sulphuric acid is an acid and soda is an alkali, and when the two are thrown together there is a reaction and it throws off a foamy spray, that when you neutralize an acid it ceases to be an acid, practically every property of it changes and it has no power to burn; that for a chemical substance to destroy sight it must leave a scar, and that you could not have impairment of sight by chemical injury to the cornea without the formation of a scar; that any chemical to cause injury to the sight from in front would have to pass through the eyeball to destroy or soften the optic nerve, and in his opinion baking soda or any other substance that might injure the eye would leave a scar.

Doctor Chadwick, an eye specialist of Coffeyville, testified he had examined plaintiff's eye on April 20, 1932, at the request of the defendant; that he went over his face and the membranes of the lid and the globe and cornea of the eye looking for scars and sulphuric-acid burns, with which he had had considerable experience; that he did not observe any scars on the eye or any indication of any burn of any kind; that the only way acid thrown in the eye could destroy the eye would be by forming scar tissue and he found no indication of such tissue. He discussed the action of sulphuric acid and what is known as baking soda, and that when they are thrown together they produce Glauber Salts, which is the same thing as horse salts, and stated that in his opinion soda and sulphuric acid will not destroy sight without destroying the tissues of the eye, and that in his opinion plaintiff's optic nerve of his left eye was not affected or destroyed by any chemical cast therein. He further testified he examined the eye with instruments and did not find any scars, but did find the optic nerve was pale.

The court then appointed Doctor Thomas and Doctor White of Coffeyville to examine plaintiff's eye and adjourned the hearing until the following day. At that hearing Doctor Chadwick was further examined, and stated that from his examination he was convinced that the inflammation was not within the orb of the eye, but was in the brain, and that he saw no indication of the reaction of sulphuric acid in the eye or in the brain. He was convinced plaintiff was blind in that eye. He further stated that in his opinion plaintiff's blindness was caused by inflammation in the optic tract at the base of the brain and was of slow development, but he had no opinion of the time it took plaintiff's condition to develop, but that the inflammation was not due to the action of germs entering the eye.

Doctor Thomas testified that he had examined plaintiff's eye the day before and found no scars from burns or acid; that the left eyelid was slightly drooping, the pupil widely dilated and fixed, the cornea, aqueous and vitreous humors clear, and the optic nerve pale, which indicated a lack of function of the optic nerve, and that with such lack of function blindness results to a greater or lesser degree. He did not observe any destruction of the tissues of the eye; that a slight burn might not leave a scar and yet it might be sufficient to cause inflammation by germs entering the body. He would not like to state what caused the drooping eyelid, but presumed it was the same thing that caused the atrophy to the optic

nerve, that in his opinion the paralysis was caused by a sympathetic infection, and that acid burns had nothing to do with any systemic infection, and that his opinion, that acid had nothing to do with the condition of plaintiff's left eye, was based on the fact he found no scars in the eye. So far as the abstract shows, Doctor White was not called as a witness.

The case was submitted to the jury under instructions to which reference is hereafter made, and it returned a general verdict in favor of the defendant and answered five special questions, which may be summarized: That plaintiff irrecoverably lost the sight of his left eye prior to April 12, 1932, the loss being gradual; that the eye was not afflicted prior to January 12, 1932; that plaintiff had no physical, nervous or constitutional disorder affecting his eyes or the sight thereof prior to January 12, 1932, and that plaintiff at the time of trial had no scars on the upper lid, lower lid, conjunctiva or cornea of his left eye. Plaintiff promptly moved for judgment on the special questions notwithstanding the general verdict, and for a new trial. Both motions were denied and he appeals.

Judgment *non obstante* cannot be rendered unless the answers to the special questions are not only inconsistent with the general verdict, but compel a different judgment.

It was the duty of the trial court and it is our duty to harmonize, if possible, the answers to the special questions with the general verdict. (See *Durkin v. Kansas City Public Service Co.*, 138 Kan. 558, 562, 27 P. 2d 259, and cases cited.)

There were two main questions at issue in the trial. (*a*) Did plaintiff get the spray from the fire extinguisher in his left eye? and (*b*) did that cause the irrecoverable loss of the eye? It will be noted first that no special question was submitted as to whether or not the spray entered the eye. While it is true plaintiff testified it did get in his eye, the testimony of all of the doctors, except Doctor Gasser, was to the effect that anything touching the eyeball which would have an injurious effect would have left a scar and there was no scar, and the jury, by its general verdict, either found the spray did not reach the eye, or if it did, it had no injurious effect. As to whether the eye was burned, all of the expert testimony was to the effect that any substance which would cause injury would leave a scar, and the jury answered the special question there was no scar. Do the answers to the question showing that prior to the date of the accident plaintiff had no affliction of his eyes and that within

ninety days thereafter he had irrecoverably lost the sight of his left eye compel a judgment against defendant? By its general verdict, the jury found that defendant was not responsible for that condition, and there is nothing in the answers that compels a different conclusion, and this is especially true in view of the testimony that plaintiff's eye condition was caused by inflammation in the optic tract from the brain, and not from anything entering the eye from the front. The testimony has been set out in considerable detail, and it would not help here to restate it. It is clear from the testimony which supports the general verdict, and from the answers to the special questions, that the answers are not inconsistent with the general verdict.

Complaint is made of the instructions, especially Nos. 1, 4, 5 and 6. The first and sixth instructions are substantially alike, and while one of them might well have been omitted, the repetition of itself was not prejudicial. Both say that if the jury believe from a preponderance of the evidence that the sight of plaintiff's left eye is irrecoverably lost, and that such loss resulted directly, exclusively, solely and independently of all other causes from the liquid spray plaintiff alleged was cast into his left eye, and that such loss, if any, resulted within ninety days after the date the spray was cast, if it was so cast, and that it was cast accidentally, the plaintiff should recover. The fourth instruction, in substance, was that if the jury was not so convinced by a preponderance of the evidence, then the verdict should be for the defendant, although it might believe that plaintiff has suffered pain, loss of time, or general physical or nervous disability on account of some affliction to his eye or eyes. As to these instructions, the principal complaint is that the words "directly, exclusively, solely and independently of all other causes" are used, and that, though the words are used in the two sections of the policy quoted above, the combined effect of using them is to put too narrow a construction on them, in that they limit the recovery to the injury, and do not include the result of the injury, citing *Casualty Co. v. Colvin,* 77 Kan. 561, 95 Pac. 565; *Samson v. United States Fidelity and Guaranty Co.,* 131 Kan. 59, 289 Pac. 427, and *Thomas v. Mutual Benefit, Health & Acc. Ass'n,* 136 Kan. 802, 18 P. 2d 151. In connection with that argument, attention is then directed to the fifth instruction, which states "if you believe from all the evidence that the spray from the fire extinguisher was cast into plaintiff's left eye, but that such spray merely contributed to a

diseased condition of such eye, or with other causes, resulting in the irrecoverable loss of sight of such eye, then your verdict must be in favor of defendant and against plaintiff."

In the Colvin case, *supra*, a policy somewhat similar to the one here was construed. In that case on January 9 the insured sustained a fall, striking on timbers which bruised his chest. He lost six days' time and then continued to work until January 29. On January 31 he called a physician, who thought he had pleurisy or pneumonia. On February 16, after further diagnosis, an operation was performed which disclosed pus in the chest cavity. He died on March 7. The company defended on the ground the accident did not cause "at once total and continuous inability to engage in any labor or occupation," and that the death was not caused "necessarily and solely from such injury." The jury found for the plaintiff. In disposing of the company's contention, this court said:

."In an action by the beneficiary named in such a policy to recover the stipulated indemnity for the death of the insured, who died from an accidental injury, the condition that such death must have resulted 'necessarily and solely' from such injury will be satisfied by showing that the injury was the predominating and efficient cause of the insured's death; the fact that other conditions were set in motion by the injury which may have contributed to such result is immaterial." (Syl. ¶2.)

The other cases relied upon by appellant approve that rule. Under that rule were the above instructions erroneous, and was the test laid down by the court too harsh? Bearing in mind that the testimony of plaintiff showed that he received the spray in his eye and thereafter in about ten days the sight was gone, and that the expert testimony was to the effect that for the spray to have injured the eye it would have had to burn, and that such burning would have caused scars, and there were no scars, was there any room in this case for an argument that the accident set in motion conditions which caused the loss? If there was not, there was no occasion to frame an instruction on that theory. While the plaintiff did object to the instructions given, he did not request any instruction embodying the theory he now advances. So far as can be determined from the record, the plaintiff relied upon the jury's believing that he received the spray in his eye and that it directly, if not immediately, destroyed the sight. We are of opinion that the instructions complained of were not erroneous as applied to the facts of this case, and that the jury was not misled as to the issue to be decided.

Appellant also complains that the court abused its discretion in appointing a commission of physicians to examine plaintiff's eye. It appears that plaintiff's first doctor sent plaintiff to an eye specialist, Dr. T. E. Smith, for treatment. Plaintiff subpœnaed Doctor Smith, but did not call him as a witness. After plaintiff had rested his case, defendant called Doctor Smith and upon attempting to examine him concerning plaintiff's eye was met with an objection that what plaintiff said to Doctor Smith and what Doctor Smith observed were privileged. The court, expressing doubt, out of caution sustained the objection. We are not here concerned with the correctness of his ruling. In this state of affairs, the court allowed defendant's application to have a commission of physicians appointed, and made the appointment. In *Ottawa v. Gilliland*, 63 Kan. 165, 65 Pac. 252, the second paragraph of the syllabus recites:

"In an action to recover damages for personal injuries, the trial court may require the injured party to submit the unexposed portion of his person to a private examination by physicians or surgeons appointed by the court, when, in the exercise of a sound judgment, it appears to the court that the necessity of the case demands such an examination." (Syl. ¶ 2.)

And in the opinion it was said:

"In an action for personal injuries, the injured party may call physicians, to whom he may expose his person, not for the purpose of effecting a cure, but for the purpose of using this expert testimony to assist him in the trial of his case. He may also expose the injured portion of his person to the jury, observing the rules of decency. Should the litigant be permitted to withhold the truth or the means of ascertaining what the truth is simply because, in the ascertainment of the truth, he may conceive the idea that an indignity is being offered? That is not an indignity which is not so intended. May he be permitted to present so much of the truth as he desires and as he thinks to his interest and withhold the remainder? This would certainly be his privilege if the court does not possess the power to make an order that will develop the exact truth." (p. 170.)

Under the circumstances narrated it cannot be said the trial court abused its discretion.

A review of the record in this case shows that it is mainly a fact case, decided by the jury adversely to the plaintiff. No error appears, and the judgment of the lower court is affirmed.