No. 43,113

Joseph M. Underwood, *Appellee,* v. Missouri-Kansas-Texas Railroad Company, *Appellant.*

(381 P. 2d 510)

Opinion filed May 11, 1963.

*Paul L. Wilbert,* of Pittsburg, argued the cause, and *Randall D. Palmer, E. Carter Botkin* and *Alois R. Bieber,* of Pittsburg, and *Frank J. Rogers,* of Kansas City, Missouri, were with him on the briefs for appellant.

*Payne H. Ratner, Jr.,* of Wichita, argued the cause, and *Payne H. Ratner, Louise Mattox, Cliff W. Ratner, R. R. Barnes* and *Tyler C. Lockett,* of Wichita, and *Davis S. Carson* and *Murvyl M. Sullinger,* of Pittsburg, were with him on the briefs for appellee.

The opinion of the court was delivered by

Fatzer, J.: This was a personal injury action brought by the plaintiff, Joseph H. Underwood, an employee of the defendant railroad, pursuant to the Safety Appliance Act (45 U. S. C. A., § 1, *et seq.*). These acts are substantially, if not in form, amendments to the Federal Employees Liability Act (45 U. S. C. A., §§ 51-59), and are supplemental to the latter act. (*Urie v. Thompson,* 337 U. S. 163, 93 L. Ed. 1282, 69 S. Ct. 1018.)

Following a trial on the merits, the jury awarded the plaintiff damages in the amount of $34,000. The defendant's post-trial motions were overruled, and the district court approved the jury's verdict and entered judgment for the plaintiff. The railroad company has appealed.

The evidence disclosed that the plaintiff was injured on December 27, 1960, while working as a switchman in the defendant's yards in

Parsons, Kansas. At the time of the trial the plaintiff was 46 years of age and had been employed by the defendant a little over 20 years. He testified he had not sustained any prior back or neck injuries.

On the day in question plaintiff and his crew were switching two "bad order" or defective cars which had been cut out of defendant's train for the purpose of moving the cars to the "rip" or repair track. One was a flat car loaded with posts and the other was a tank car. It was the plaintiff's duty to board the cars and apply the hand brake so as to keep the cargo from shifting and doing further damage. As the cars came past the plaintiff they were traveling northward about six miles per hour with the tank car in the lead. Plaintiff observed the brake was clear on the tank car and the brake on the flat car was fouled by the posts—the posts had already shifted so that they were pushing the hand brake. Plaintiff attempted to board the tank car to apply the hand brake. There are three steps on the first ladder up to a platform that runs around the edge of the tank car. Above the platform and running around the entire tank is a handrail to enable the workmen to safely stand on the platform and walk around the car or apply the brake. Plaintiff climbed up four or five feet on the ladder and reached up with his right hand to get hold of the handrail to pull himself up on the platform but when he pulled on the handrail it broke and came loose and caused him to fall backward from the car landing on his left hip on a rail of an adjoining track. He fell doubled up and his momentum caused him to fall so that his head struck the ball of the rail. Other cars had been switched on the track upon which he fell and plaintiff saw them coming toward him. He rolled off toward the west, got up and walked down to where the tank car was, picked up the piece of the handrail which had broken off from the car and walked back up to the switch shanty. He testified he did not feel good, that he was sore and shaken up but was still able to walk around. A fellow workman, L. J. Cary, was standing near where the accident occurred. Plaintiff reported the accident to his foreman, and stated they would have to make out a 335 (accident) report. He did not make the report that afternoon, but went home, took some aspirin and went to bed. The next morning he attempted to call Dr. Beaty, the company physician in Parsons, but it was the doctor's day off. When he saw Dr. Beaty on December 29, 1960, he was having headaches, his neck and shoulders were stiff and he had pain

down through his back and hips. Plaintiff worked January 2, and 3, 1961, but had severe headaches and became very tired. On January 3, plaintiff took a picture of the tank car before it was repaired. He returned on January 6, after the car had been repaired and took two more pictures. All of the pictures were admitted in evidence at the trial.

During January the headaches continued. When plaintiff moved around, his back, legs and arms hurt and he went to Dr. Beaty to try to get some relief but the pills prescribed did not help.

On February 21, 1961, plaintiff went to see a specialist, Dr. W. W. Hurst, a member of the American Association of Railroad Surgeons, at Joplin, Missouri. Dr. Hurst examined him and prescribed a leather brace with metal reinforcements to be worn around the lumbar section of his back, and also prescribed exercises. Plaintiff wore the brace and followed the exercises prescribed. Plaintiff saw Dr. Hurst again on March 6, and on April 3, 1961, and at those times Dr. Hurst gave him diathermy treatments. On March 28, 1961, Dr. Beaty referred the plaintiff to a specialist in Kansas City who examined him. About the end of March the soreness started to work out of plaintiff's neck and back. Dr. Hurst advised plaintiff he could try working if he wore the brace and Dr. Beaty examined him and released him for work. On April 21, plaintiff reported for the same job he previously had.

Plaintiff wore the brace while working, but he had trouble sleeping, and could not lie down at night without getting up and walking around. His back continued to hurt. He worked four days, had two rest days, and was off three days. During May he was off sick but it was not his back. On May 2, he was hit by an air hose when he uncoupled a car. It hurt his leg and he laid off from work on May 5, on that account and for pain in his back. Plaintiff's job necessitated that he do a great deal of walking and set many brakes, and the jar from walking and setting brakes hurt his back and shoulders. When he mounted cars moving four or five miles an hour it irritated his back and bothered him more. He was off several days in June but only one day on account of his back. He worked about eleven days as foreman where he did not have to throw as many switches or walk as much or board as many cars. The first of July plaintiff changed to foreman on the afternoon shift and worked from 3:55 to 11:55 p. m. This job was easier on him, but every time he set a brake it started his back to hurting and when

he got off of a car going too fast, it would bother him. Since the injury, his neck and head have improved considerably and sometimes he gets along pretty well with his back and at other times it bothers him.

Plaintiff lost 81 days from work which at his rate of pay of $22.50 per day totaled $1,822.50. Plaintiff's pain prevented him from sleeping and he found it extremely hard to carry on the duties of his employment. His wife testified that he was very restless and could not sit or rest any length of time. Further, that he was not able to do any lifting or run a power mower. In answer to a question whether the plaintiff's injuries were permanent Dr. Hurst answered in the affirmative and rated his disability at 25 percent of the body. He further testified that plaintiff needed an operation to fuse the 4th and 5th lumbar vertebraes with the sacrum. When questioned as to the effect of plaintiff's permanent injury as related to loss of future earnings Dr. Hurst testified that plaintiff could not do heavy work such as setting brakes on a box car or stooping under a box car because of his wearing a back brace and the fact that his spine was not supple. He further testified that plaintiff's spinal injury would shorten his period of being industrially employable. Dr. Hurst made the following answers to the following questions:

"Q. Let me ask you this: Is this type of injury one that causes pain in an individual such as Mr. Underwood?

"A. Yes, he has typical pain symptoms—You can almost make a diagnosis from what the man told you if you listen to his story: pain, low back, radiating out into the buttocks, and I venture to say, all spondylolisthesis cases make the same complaint, and I can almost make a finding before x-ray.

"Q. Do you expect him to have pain in the future?

"A. Yes, he will have pain—he has got to accept it."

Upon cross-examination Dr. Hurst testified that plaintiff did have a developmental defect in his low back consisting of a failure of fusion of the lamina arches that protect the spinal cord. He explained that the spinal ligaments hold the vertebraes in position but that when sudden stress is placed upon them, the ligaments tear and allow a hemorrhage to occur.

Two medical experts testified for the defendant. The first was Dr. Beaty who testified he found the developmental defect described by Dr. Hurst and described the defect as "spondylolisthesis." He agreed that with this type of spine it would take less injury to make it disabling than with a normal type of back. He further testified that plaintiff would not be acceptable for employment by the de-

fendant; however, he expressed an opinion that the plaintiff could carry on his duties as a switchman.

Dr. William T. Braun, Pittsburg, Kansas, examined plaintiff once, and testified that since plaintiff had been working he was not disabled, apparently ignoring the fact that an employee could have a partial disability and still return to his job.

We are advised in plaintiff's brief that after the case was tried plaintiff underwent the operation on his spine recommended by Dr. Hurst and the defendant has removed him from service on the ground that he was not physically qualified to perform the duties of a switchman.

The jury made the following answers to a special question asked by the district court:

"If you find that Joseph M. Underwood is entitled to recover, state what amount of damages, if any, he is entitled to and what you are allowing for each of the following:

| | | |
|---|---|---|
| (a) | Value of earnings lost by Joseph M. Underwood to the date of trial | $1,822.50 |
| (b) | Physical pain and mental suffering to date of trial | $1,949.00 |
| (c) | Physical pain and mental suffering in the future | $1,971.00 |
| (d) | Permanent loss or impairment of ability to earn a livelihood in the future, reduced to present value | $28,257.50 |
| | Total Damages | $34,000.00" |

In harmony with its answers to the special question the jury returned the following verdict:

"We, the Jurors impaneled and sworn in the above-entitled case, do on our oaths find: the issues herein joined in favor of the plaintiff and against the defendant and we assess as the amount of plaintiff's recovery the sum of $34,000.00."

The defendant filed two motions; one to set aside the answers to (a), (b), (c) and (d) of the special question for the reason that they were contrary to the evidence and were not supported by any evidence, and the other motion was for a new trial which contained some eighteen grounds, one ground being that the defendant was not permitted to introduce competent material and relevant evidence and that the verdict of the jury was given under the influence of passion and prejudice and was contrary to the law and the evidence. The motion recited that affidavits and oral testimony would be introduced at the hearing of the motions. On February 14, 1962, the defendant's motions were heard and the defendant offered no affidavits or oral testimony and the court overruled each motion and entered

judgment against the defendant in the sum of $34,000 with interest.

The defendant first asserts as error that, under the facts and circumstances, the verdict of the jury was excessive and given under the influence of passion and prejudice. The decisions of the Supreme Court of the United States are controlling as to the interpretation and effect of the Federal Employers Liability Act (*White v. Thompson*, 181 Kan. 485, 312 P. 2d 612), and the same rule is applicable with respect to the interpretation and effect of the Safety Appliance Act. In *Brady v. Terminal R. R. Assn.*, 303 U. S. 10, 82 L. Ed. 614, 58 S. Ct. 426, it was said:

". . . The statutory liability (in relation to the use of a defective car) is not based upon the carrier's negligence. The duty imposed is an absolute one and the carrier is not excused by any showing of care however assiduous. . . ."

The record clearly indicates that the defendant did not contest its liability under the Safety Appliance Act but elected to defend the cause on the theory that plaintiff sustained minimal injuries, that is, the severity and extent of the plaintiff's injuries was the only issue presented to the jury.

There was evidence to support the answer to special question (*a*) determining the value of earnings lost by the plaintiff to the date of the trial. The record indicates he lost 81 days of work and was earning $22.50 per day. There was also evidence that the plaintiff sustained physical pain and mental suffering upon which the jury could base its answer to special question (*b*). Likewise, the evidence was undisputed that in the future the plaintiff would sustain physical pain and mental suffering upon which the jury could ascertain and fix the amount of damages in its answer to the special question (*c*). Dr. Hurst, in answer to whether the plaintiff would have pain in the future, said, "Yes. He will have pain—he has got to accept it."

While the medical evidence was conflicting as to whether the plaintiff was disabled, Dr. Hurst's testimony was to the effect that he was disabled, and rated his disability at 25 percent to the body. He also testified as to the effect of plaintiff's permanent injury as related to loss of future earnings and stated that he could not do heavy work because of wearing the back brace and that the plaintiff's spinal injury would shorten his period of being industrially employable.

Some 90 years ago in *Union Pacific Rly. Co. v. Milliken*, 8 Kan. 647, this court, speaking through Mr. Justice Brewer, stated:

". . . No fixed rule can be laid down for estimating the damages to be awarded for physical injuries. Great latitude is of necessity allowed to a jury, and within certain limits their assessment, whether inadequate or excessive, cannot be disturbed. . . . Outside of those cases in which the question of exemplary or punitive damages is involved, the basis of the assessment is compensation. No verdict is right which more than compensates; none which fails to compensate . . ." (l. c. 655.)

We are of the opinion the district court did not err in overruling the defendant's motion to set aside the answers to the special question or in finding that the answers were supported by the evidence. The jury saw the plaintiff and heard him testify and it also heard his expert witnesses and the defendant's two expert witnesses testify concerning his disability and its extent. As reasonable persons, the jury, in its answers to the special question, advised the amount allowed for the particular elements of damages and also advised the amount to compensate plaintiff for permanent loss or impairment of ability to earn a livelihood in the future. Equally important is the fact that the district court observed the witnesses and noted their demeanor in giving their testimony and thereafter it approved the verdict and its judgment is entitled to great weight. (*Groff v. Automobile Owners Safety Ins. Co.*, 180 Kan. 518, 524, 306 P. 2d 130.)

In *Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321, this court reviewed an appellant's claim that the jury's verdict was excessive where medical testimony rated the plaintiff's injuries at 25 to 35 percent permanent disability. It was held that a verdict of $29,458 was not excessive for the injuries sustained by a plaintiff who was 34 years of age and employed as a housewife. In the instant case, the plaintiff is the breadwinner of the family with a life expectancy of 27 years. He was capable of earning $550 per month and his permanent disability was rated by competent medical testimony at 25 percent. In the Pence case, it was held:

"Generally speaking, it may be said that no verdict is right which more than compensates, and none is right which fails to compensate. Pain and suffering have no known dimensions, mathematical or financial, and there is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of exact proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries sustained, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." (Syl. ¶ 3.)

This court has the power to review the order of the district court refusing to set aside a verdict as excessive. If we would reverse, it must be because of an abuse of discretion. If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem requires restraint. We are required to resolve any doubtful issue in favor of the judgment of the district court. In *Purvis v. Brenner*, 189 Kan. 369, 369 P. 2d 253, it was said:

". . . we are convinced the instant appeal discloses this was preeminently a fact case where, on the basis of conflicting but nevertheless substantial competent evidence, the jury, as was its province, properly resolved all factual issues joined by the pleadings under special findings and a general verdict which were ultimately approved by the trial court. In such a situation the rule, so well-established as to require no citation of the authorities supporting it, is that the findings of fact and the general verdict of the jury based on conflicting evidence, when approved by the trial court, will not be disturbed on appellate review. .. .. .". (1. c. 374.)

It is next contended that the district court was guilty of an abuse of discretion in unreasonably restricting the defendant in the use of medical expert witnesses. This assignment of error stems from proceedings at a pretrial conference on December 13, 1961, where the following colloquy took place:

"Court: . . . How about the matter of physical examination?

"Mr. Rogers: Defendant would like a physical examination, Judge. About the time, or maybe it was shortly before the suit was filed, we arranged for this man to be examined, the upper part of his body, of which he was complaining at that time, and the pain has moved down in his lower back, and we should like a complete examination of the gentleman.

"Mr. Ratner: Who was it examined him before for the upper part of his body?

"Mr. Rogers: Dr. Carmichael, Kansas City. I sent you folks a copy of his report.

"Mr. Ratner: I wondered if that is who it was. We have no objection as long as we are furnished with a copy of the report but I just turned to the report, opened it, and first thing that caught my eye was 'The neck and head symptoms are improving. The low back pain is becoming more severe.' So, obviously, Dr. Carmichael's examination was both low back and upper.

"Mr. Rogers: Well, we didn't x-ray his low back, and Dr. Carmichael is a neuro-surgeon.

· · · · · · · · · · · · · ·

"Mr. Ratner: I just wanted to mention that, but we have no objection to your having another examination.

"Court: I think they would be entitled to one in view of the time that has elapsed anyway, so plaintiff will make himself available for that examination. I presume you don't have the doctor?

"Mr. Rogers: We have the doctor—we would like to have Dr. W. T. Braun, here in Pittsburg, and x-rays by Dr. Vernon A. Berkey, and we would like to have them within the next two weeks. . . .

"Mr. Ratner: We object, of course, to them not using the same doctor they had before, which is kind of loading up on doctors here.

"Court: Let me ask you this, in requesting this examination openly here —I think, as I stated, you are entitled to a subsequent examination because of the length of time. I don't think you will be entitled to use both these witnesses. If you want to have the man re-examined by Dr. Carmichael, of course that would be permissible too. If you use a local doctor here I think you would be confined to using his testimony on trial and not also use Dr. Carmichael.

"Mr. Rogers: Court please: Dr. Carmichael is primarily a neuro-surgeon and this man's complaints first were of the upper parts of his body—that is what his examination was directed to—he didn't examine the lower part of his anatomy although the man had some complaints at that time—Dr. Carmichael didn't direct his examination to the lower part of his body, so it wouldn't be repetition if we had a local physician here examine the man for his present back complaints.

"Court: Let me make the Court's position clear, Mr. Rogers, and you can make up your own mind. You don't have to do it right now, but you are entitled to either one of two things: re-examination by Dr. Carmichael, or an entirely new and separate examination which you may use for the purpose of presenting here in Court, but you are not entitled to another examination and present both of these medical witnesses.

"Court: . . . The privilege of defendant to examine plaintiff of course is not absolute. It is the feeling of the Court you are entitled to examination but not multiple examinations.

"Court: Unless there is some unusual situation, such as an eye injury or something that requires a special type of examination, we have permitted more than one examination in cases of that type, but if you want to use Dr. Carmichael you can have this man re-examined by him if he didn't cover everything.

"Mr. Rogers: Well, of course, that sort of puts us in an awkward position, Judge. He was sent to an expert in neuro-surgery, that is the head and upper part, the nerve part, due to his complaints at that time . . . I understand . . . his complaints have shifted to the lower part of his anatomy now . . .

"Court: Well, Dr. Carmichael is very well qualified along those lines.

"Mr. Ratner: For some strange reason the nerves don't stop at the waist— they go on down.

"Court: In my experience he has examined a number of people for low-back complaint. If you want to re-submit him to Dr. Carmichael that is

agreeable. If you don't feel he covered the matter, you would want him re-examined before trial, I assume?

"MR. ROGERS: Yes, we want him re-examined. Is it the ruling of the Court we have the option of either Dr. Braun or Dr. Carmichael only, we will be limited to one or the other as witnesses?

"COURT: Yes."

On direct examination the plaintiff testified that on February 21, 1961, he went to a specialist, Dr. Hurst, at Joplin, Missouri, and he also testified that on March 28, 1961, he was referred to a specialist by Dr. Beaty (although not named, the referral specialist was Dr. Carmichael). On the cross-examination of Dr. Beaty the plaintiff again brought out that Dr. Beaty had referred him to a specialist. The defendant contends that, in the face of all the reference of plaintiff to defendant's specialist, the court was guilty of abuse of discretion in refusing to permit the defendant to call Dr. Carmichael of Kansas City, and that it erred in refusing to instruct the jury that the court had limited the defendant to only one medical witness.

The defendant appears to be laboring under a misapprehension of its legal rights. There are no statutory provisions providing for a physical examination of plaintiff by doctors of the defendant's choice. The rule announced in *A. T. & S. F. Rld. Co. v. Thul,* 29 Kan. 466, has been consistently followed. There the court said:

". . . We would think that the defendant in a case like the present would be entitled as a matter of right, upon a proper application and upon a proper showing, to have an order made by the court compelling the plaintiff to submit himself to a personal examination, for the purpose of ascertaining the nature, character, extent and permanency of his injuries; but of course the court should exercise a sound judicial discretion in making such an order. The right to the order, being founded upon necessity, would not of course extend beyond the necessities of the case. If sufficient evidence of this kind had already been introduced, the Court of course would not be bound to make the order for the purpose of obtaining other merely cumulative evidence. . . ." (l. c. 475, 476.)

See, also, *Ottawa v. Gilliland,* 63 Kan. 165, 65 Pac. 252; *Dickinson v. Railway Co.,* 74 Kan. 863, 86 Pac. 150; *Landis v. Street Railways,* 110 Kan. 205, 203 Pac. 1109, and *Howard v. Hartford Accident & Ind. Co.,* 139 Kan. 403, 32 P. 2d 231.

The record does not indicate that any order was made pursuant to G. S. 1949, 60-2705, reciting the action taken at the pretrial conference with respect to any agreements made by the parties as to any of the matters considered, and which limited the issues for

trial to those not disposed of by admissions or agreements of counsel. Be that as it may, it is clear that the discussion at the pretrial conference pertained to the matter of the plaintiff's physical examination by the defendant. In authorizing the defendant to have the plaintiff examined by a medical expert, the court made it clear that if the defendant wished to have Dr. Carmichael examine the plaintiff it could do so or that it could have the option of having a doctor who had not previously examined him make a complete physical examination. The defendant selected the latter option and had Dr. Braun of Pittsburg make a complete spinal examination of the plaintiff and it must be said that the court gave the defendant the right to assume that it would be limited to one or the other to testify at the trial.

We think the defendant has failed to show abuse of discretion on the part of the district court. No effort was made to take the deposition of Dr. Carmichael and offer it at the trial nor was he subpoenaed by the defendant to appear and testify, nor was he offered as a witness at the trial. While the defendant's motion for a new trial stated that affidavits and oral testimony would be offered at the hearing on the motion, it failed to produce any evidence, and under those circumstances we have no hesitancy in holding that the defendant was required to offer Dr. Carmichael's testimony at the trial and if the court refused to permit him to testify, to make a proffer of such evidence and to reoffer it at the hearing on the motion for a new trial.

Other points have been raised by the parties some of which were not raised on the motion for a new trial and under the rule announced in *Brick v. Fire Insurance Co.,* 117 Kan. 44, 230 Pac. 309, these points must be held to have been waived. In that opinion it was held:

"Errors of the trial court occurring during the trial and which constitute grounds for a new trial, to be reviewable on appeal, must have been brought to the attention of the trial court on a motion for a new trial, and if such errors are not specifically pointed out in the motion or upon the presentation of the motion, and no opportunity is given to the court to reconsider and correct such errors, they will as a general rule be regarded as waived." (Syl. ¶ 2.)

See, also, *Butts v. Kan. Power & Light Co.,* 165 Kan. 477, 195 P. 2d 567, and *Rierson v. Southern Kansas Stage Lines Co.,* 146 Kan. 30, 69 P. 2d 1.

The defendant also argues that the district court erred in giving instructions Nos. 3, 5, 9 and 12. The point is not well taken. The

defendant made no request for specific instructions in place of or in addition to the instructions complained of. In *Boucher v. Roberts*, 187 Kan. 675, 359 P. 2d 830, it was said:

"We have said many times that under our statute ( 60-2909 *Fifth* ) if a party desires more specific instructions, it is his duty to make a request therefor. We have repeatedly held the failure of the trial court to instruct specifically on a given proposition cannot be properly assigned as error when no request for such instruction was made. . . ." (l. c. 677.)

We have examined the instructions given and in conformity with the established rule, they must be considered as a whole and all must be considered together to determine whether the theory and contentions of each party are presented, and an erroneous instruction does not of itself require reversal if all of the instructions considered together substantially state the law. The instructions complained of deal with the defendant's liability under the Safety Appliance Act and regulations adopted by the Interstate Commerce Commission (Title 49, Code of Federal Regulations, § 131.7 [F]) promulgated pursuant to Title 45 U. S. C. A. § 12, and fairly state the law applicable in the instant case.

We have carefully reviewed the record and find no reversible error. The judgment of the district court is affirmed.