256 So.2d 883

Barrett SHEPHERD

v.

SOUTHERN RAILWAY COMPANY, a Corp.

6 Div. 728.

Supreme Court of Alabama.

July 16, 1970.

Rehearing Denied Sept. 10, 1970.

Rives, Peterson, Pettus, Conway & Burge, W. Eugene Rutledge, Birmingham, for appellant.

Cabaniss, Johnston, Gardner & Clark, and Crawford S. McGivaren, Jr., Birmingham, for appellee.

HARWOOD, Justice.

In the suit below the plaintiff claimed damages of $100,000.00 for personal injuries sustained by him in the course of his employment by the defendant as a member of a switch engine crew. The complaint averred that his injuries resulted when the air hoses between two railroad cars became uncoupled, and one of them flailed about, striking him on the left jaw. His jaw was broken and a jaw tooth was knocked out, and he was caused to suffer great physical pain and mental anguish, and had to undergo hospitalization and medical and surgical treatment. The complaint further averred that plaintiff's injuries were the proximate result of a violation by the defendant of one of the Federal Safety Appliance Acts generally known as the "Air Brake Act" and that the defendant operated its railroad interstate.

The trial resulted in a verdict in favor of the plaintiff, his damages being assessed at $14,000.00.

The defendant duly filed a motion for a new trial and after a hearing thereon the court entered an order granting the motion. This appeal is from such order.

Since the plaintiff and defendant occupy the same relative position on this appeal as they did in the trial below, they will hereinafter be referred to as the plaintiff and defendant.

In the trial on the merits the plaintiff testified that he, in carrying out his employment, had coupled the air hoses between two cars. When he turned on the air valve the hoses came apart, and flailed

about. The metal fitting on the end of one of the hoses struck him on the jaw, knocking out a tooth and breaking his jaw.

The plaintiff further testified that on this occasion he had carried out the procedure of coupling the air hoses as he had been instructed in the brakeman's school conducted by the defendant, and as he had previously done in thousands of instances.

He had seen air hoses burst, but these instances involved the rubber part of the hose. This was the first time he had seen an air hose become uncoupled. When coupled air hoses are supposed to remain coupled.

L. R. Willard, an employee of the defendant for some thirteen years, was yard foreman at Winston-Salem, North Carolina, and a member of the switching crew at the time of plaintiff's injuries.

Willard first saw the plaintiff as he came around the end of a car. He was holding his jaw and had a tooth in his hand. The plaintiff could not talk too well but tried to tell him he had been struck in the jaw with an air hose.

Willard and another crew member, Kenneth Roberts, went to the site where the plaintiff had been coupling the air hoses. They found the air hoses uncoupled. They observed nothing wrong with the hoses, and one or the other of them coupled the hoses together, and they observed nothing defective in the couplings.

Willard testified that on two occasions he has seen air hoses become uncoupled when they were not supposed to—it is not a common occurrence but it does occur.

Kenneth Roberts, also a member of the crew with which the plaintiff was working, gave testimony largely in accord with the testimony of the witness Willard.

Roberts did further testify that on one occasion he was riding on the "floor board" between an engine and a car when an air hose between the engine and the car "flew

apart" and hit him on the leg—"knocked me for a loop, really." Roberts had coupled the air hoses himself, and had coupled them properly.

R. M. Hutto, who had worked as brakeman and switchman for the defendant for over fifty-one years, until his retirement, testified that he had coupled thousands of air hoses during his employment. Mr. Hutto demonstrated to the jury the proper procedure for coupling air hoses.

He has had air hoses that he had coupled and turned air into in the manner demonstrated, come loose "lots and lots of times." Afterwards he would recouple the hoses and they would work all right.

Mr. Hutto further testified that the fifteen years ago he had been hit on the leg by an air hose becoming uncoupled, and that he carried a scar on his leg from this blow. He himself had coupled this hose and cut the air into it when it flew around and hit his leg. Afterwards he recoupled the air hose and it worked properly.

Mr. Hutto further testified that the incident happened "about fifteen years ago." At the request of plaintiff's counsel, he exhibited his leg to the jury.

On cross examination Hutto denied that he had testified against the defendant in several cases, or that his frequent visits to the office of plaintiff's counsel had necessarily been in connection with cases against the defendant.

Mr. Hutto further testified on cross examination that he had made a claim for the air hose injury, and had made about three claims for injuries while working for the defendant.

On re-direct examination Hutto testified he had made his claim for the air hose injury through the claim department of the defendant.

For the defendant, Walter Sebastian and R. A. Zimmerman, longtime employees of the defendant, testified they had examined the air hoses pointed out to them as being

the ones that injured the plaintiff. Their inspection of the hoses revealed no defect. They coupled the air hose and kicked the hose to see if it would come uncoupled. It did not. No air was let into the hose during this examination.

James Whitler, General Yard Master for the defendant, and Thomas C. Mims, a claim agent, testified that they visited the plaintiff in the hospital. The plaintiff's jaws were wired together at this time.

When asked how the accident happened, the plaintiff stated he did not know. Mims testified that the only thing the plaintiff ever told him about the accident was that he was hit in the face with an air hose.

Clarence Frick, General Foreman in charge of the defendant's mechanical department, examined the air hose shortly after the plaintiff's injury. At this time the air hose had been coupled to an engine and air had been turned into the hose. His inspection revealed no defect in the air hose or the coupling. Mr. Frick testified in detail as to how the couplings of air hoses work, and stated that in his opinion, if properly coupled, an air hose could not come apart upon turning air into it.

At the hearing on the motion for a new trial the court heard arguments as to several grounds of the motion in the absence of a court reporter. Upon the commencement of the hearing of the grounds pertaining to newly discovered evidence (grounds 33, 34, 36 and 37), a court reporter was called in and this portion of the hearing was taken down.

The defendant offered the affidavits of C. G. Crawford and Hon. Leigh M. Clark, attorney for the defendant. The attorney for the defendant then announced he had subpoenaed R. M. Hutto, "to make him available for the court" though he did not wish to place Hutto on the stand unless it was understood that he would be the court's witness.

Plaintiff's counsel made known he did not intend to put Hutto on the stand, but upon the court stating, "I want to know what he says about it," plaintiff's counsel stated he would place Hutto on the stand.

On direct examination Hutto testified that he had received the air hose injury about which he had testified in the trial, at Corona, Alabama, in the latter part of 1948, or the first part of 1950. He was off five days, and "I don't remember whether it was Mr. Cameron, O. K. Cameron, or Mr. Mauney, the superintendent, and he gave me a voucher for the days I was off."

On cross examination Hutto denied he had told Mr. Crawford, when Crawford had interviewed him after the trial, that he had settled his claim for the air hose injury with Mr. Walton of the defendant's employment department. Hutto admitted he had told Crawford that he had gone to Dr. Cunningham, a company doctor in Corona, for treatment of his air hose injury, but stated that this was wrong, he had gone to Dr. Harrison who was not a company doctor for the defendant. Hutto did not know where Dr. Harrison was now.

At the time of his air hose injury claims under $150.00 were handled by the superintendent, and not by the Claim Department, and he had never told Walton or anybody that the Claim Department had handled his air hose injury. (During the trial Hutto had testified he had settled his air hose injury claim through defendant's claim department.)

Counsel for defendant then showed Hutto a transcript of his testimony in the trial.

At this point counsel for plaintiff objected to further cross examination of Hutto on the ground that defendant's counsel was not submitting new evidence, but was attempting to retry the case. Here the record shows the following:

"The Court: Eugene, (counsel for plaintiff) you realize the seriousness of this charge, I assume?

"Mr. Rutledge: Yes, sir, I most certainly do.

"The Court: I am interested in knowing the truth about it. There is no verdict going to stand before me if it is based on perjured testimony and I know it.

"Mr. Rutledge: Well, in the first place, Your Honor, it's our contention that this verdict is not based on Mr. Hutto.

"The Court: I think it's based to a large extent on his testimony.

"Mr. Rutledge: This is a proceeding for a motion for new trial, and not some proceeding because we have got some criminal charge in mind against Mr. Hutto, which I don't think we need.

"The Court: If he wants to get a lawyer to represent him at this stage, he can do it, and he might need one.

"Mr. Rutledge: Your Honor, just a minute. May we have a short recess, Your Honor? (Par. ours)

\*    \*    \*    \*    \*    \*

"The Court: Let me state this for the record: In my opinion, on the trial of the case, and it's my opinion, now, that the testimony of Mr. Hutto was probably the most convincing testimony that the plaintiff offered in the trial of the case; and it's my opinion that the jury probably paid more attention to his testimony in basing a verdict in this case in favor of the plaintiff than on the testimony of any other witness; and I am interested in knowing whether or not the testimony that he gave on the trial of the case was true testimony, or not true. That is the only concern that I have at this time, in determining whether or not the testimony of this witness, which was given on the trial of this case, was true or not."

Thereafter counsel for both sides stated the motion for a new trial would be submitted on affidavits. It developed that counsel for the plaintiff had no counter-affidavits, and asked if he might prepare one, the court informed him he thought it was too late. Counsel for plaintiff then asked permission to confer with Hutto.

After this conference, counsel for the plaintiff announced that he had advised Hutto of the dangers involved if he was not telling the truth—and that he would not be questioned further if he did not so desire. Hutto had stated to him he was "ready to go ahead and be cross-examined by Mr. Clark." The cross-examination of Hutto was resumed.

Hutto denied that he had ever hurt his leg after the air hose accident other than one time when he had skinned his shin, and he had then made no claim for the skinned shin. However, upon being shown documents from defendant's files pertaining to two claims, one for a bruised left knee and skinned shin, made in May 1951, and another made 4 July 1950, for both shins being skinned, his recollection was refreshed. As to the first injury, he stated he had made a claim therefor and had gotten paid through Mr. Mauney. Hutto claimed that his air hose accident was prior to both of these claims mentioned above.

The defendant's motion for a new trial contained some 37 grounds. The court did not specify on what ground or grounds the motion for a new trial was granted.

The plaintiff-appellant has made a single assignment of error asserting as error the action of the court in granting the motion for a new trial.

█ Where, as here, the court enters a general order granting a motion for a new trial without resting it on any specific ground, if any ground contains merit, including grounds that the verdict is contrary to the weight of the evidence, the judgment granting the motion for a new trial will be sustained. Cox v. Martin, 250 Ala. 401, 34 So.2d 463.

Grounds 1–3, 5–7, 9, 14, 15, 19, and 20 are to the effect that the verdict is either contrary to the evidence, or to the great

weight of the evidence, or is not sustained by the great weight, or preponderance, of the evidence.

As pointed out in Atlantic Coast Line R. Co. v. Dunivant, 265 Ala. 420, 91 So.2d 670, with numerous citations of authority which we shall omit, cases of the type of the present one, where relief is claimed because of a violation of one of the Federal Safety Appliance Acts, such action is pursued or governed by the Federal Employers' Liability Act. The violation of the Safety Appliance Act being itself an actionable wrong, establishment of a plaintiff's right of recovery is in no wise dependent upon negligence.

It has been said that the Safety Appliance Acts are substantially, if not in form, amendments to the Federal Employers' Liability Act, and the two acts are to be read and applied together. International Great Nor. R. Co. v. United States, 5 Cir., 268 F.2d 409; Underwood v. Missouri-Kansas-Texas R. Co., 191 Kan. 338, 381 P.2d 510.

The duty of the carrier under the Safety Appliance Act is not based on the negligence of the carrier but is an absolute one requiring performance of the appliance on the occasion in question. Affolder v. New York and St. L. R. R. Co., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683. The fact that an appliance functioned properly on other occasions, both before and after the occasion in question is immaterial. The test is the performance of the appliance on the occasion in question. Carter v. Atlanta and St. Andrews Bay Ry. Co., 338 U.S. 430, 70 S.Ct. 226, 94 L.Ed. 236; Texas and Pacific Ry. Co. v. Griffith, 5 Cir., 265 F.2d 489.

The acts of Congress and federal decisional law govern our deliberations in these cases. Atlantic Coast Line R. Co. v. Dunivant, *supra.*

The plaintiff testified he had properly coupled the air hose and upon turning the air into it, the hose separated, injuring him. Willard, Roberts, and Hutto testi-

fied they had seen properly coupled air hoses fly apart unexpectedly, though the hoses had worked properly before, and after, the incident. On the other hand, defendant's witnesses, Sebastian and Zimmerman, gave testimony to the effect that properly coupled air hoses could not become uncoupled. Their inspection of the hose in question revealed no defects in the hose. They did not, however, turn air into the hose in the course of their inspections.

This contradiction in the evidence presented a question of fact within the province of the jury to resolve. If the jury believed the evidence of plaintiff and his witnesses, such evidence was sufficient to justify the verdict rendered. Smith v. Smith, 254 Ala. 404, 48 So.2d 546; Suits v. Glover, 260 Ala. 449, 71 So.2d 49; Griffin v. Respress, 281 Ala. 168, 200 So.2d 469.

Further, this being a Federal Employers' Liability Act case, judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part, even the slightest, in producing the injury or death. Rogers v. Missouri Pacific R. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed. 2d 493.

It would appear that no new trial should have been granted because of those grounds going to the sufficiency of the evidence.

Grounds 21 and 22 of the motion for a new trial are based upon the court's refusal of defendant's written requested charges numbers 1 and 2. Each of these charges are affirmative in nature. Under the plaintiff's evidence these charges were properly refused.

As set forth in Southern Ry. Co. v. Reeder, 281 Ala. 458, 204 So.2d 808:

"This court, in keeping with the decisions of the Supreme Court of the

United States in cases brought under the Federal Employers' Liability Act, has held that the affirmative charge is properly given only where there is a complete absence of probative facts to support plaintiff's claim of negligence on the part of the railroad. Louisville & N. R. Co. v. Steel, 257 Ala. 474, 59 So.2d 664; Atlantic Coast Line R. Co. v. McMoy, 261 Ala. 66, 73 So.2d 85; Atlanta & St. Andrews Bay Ry. Co. v. Burnett, 259 Ala. 688, 68 So.2d 726."

Grounds 23–28 are to the effect that the court erred in the refusal of certain special written charges requested by the defendant, that is, charges 3–8 respectively. A reading of the court's oral instructions discloses that the principles sought to be enunciated in these charges were amply covered therein.

Grounds 1–13, 16, 17, and 18 raise the point that the damages awarded are so excessive as to denote bias, prejudice, or passion on the part of the jury.

As before stated, the jury awarded damages of $14,000. Plaintiff's lost wages amounted to $3,150. This leaves $10,850 as damages for physical injury, pain, and suffering, and mental anguish.

The evidence shows that in the accident the plaintiff received a compound, comminuted fracture of his lower left jaw bone, with a fracture of a molar tooth. On 4 April 1967, the plaintiff was operated on under anesthesia. The fractured pieces of bone were set and fastened with wires. The retained root tips of the fractured molar tooth were removed. Two other tooth roots were removed. Following post operative nausea the set bone was stabilized by wiring the upper and lower jaws together. A second operation, similar to the first procedure was done on 15 April 1967, because fragments of the bone had become dislocated. There was considerable swelling with both surgical procedures. There were nutritional difficulties in that plaintiff had to get all nourishment by liquids through a straw.

The doctor who treated the plaintiff testified that the post operative results were good and there should be no limitation of the functioning of the jaw other than the loss of teeth. A re-operation may possibly be required, however, to remove the fracture wire in the jaw. Pain accompanies the type of injury received by the plaintiff.

The plaintiff testified that in addition to the pain accompanying the fracture, he suffered from headaches, and during his treatment he lost some 35 pounds. The plaintiff was hospitalized altogether 14 days, and was unable to return to work for some four months due to weakness from lack of nourishment.

■ There is no fixed standard for the ascertainment of compensatory damages recoverable for physical pain and mental suffering. The amount of such award must necessarily be left to the sound discretion of the jury, subject only to correction by the court for clear abuse or biased exercise of that discretion. Vest v. Gay, 275 Ala. 286, 154 So.2d 297; Durham v. Sims, 279 Ala. 516, 187 So.2d 558.

■ In view of the severity of plaintiff's injuries, and the undoubted pain and mental anguish accompanying the injury and treatment therefor, we do not consider that it could be concluded with any degree of certitude that the damages awarded were excessive, or resulted from bias, prejudice or passion. See Airheart v. Green, 267 Ala. 689, 104 So.2d 687, par. 8 at page 693. Grounds 10–13, 16, 17, and 18 of the motion would furnish no adequate basis for granting the motion for a new trial.

Grounds 29–32 assert error because of alleged prejudicial remarks by plaintiff's counsel during his closing argument to the jury.

In this connection, the record shows the following:

"Mr. Rutledge: (Counsel for plaintiff) I asked last night Robin Tribble to type

up and prepare for me exactly what Mr. Mims said, and I am going to read it to you. I did not suggest the date of mid-May to Mr. Mims. I said at approximately what date was that, the conversation where he—

"Mr. Clark: (Counsel for defendant) I think that was a very improper statement for counsel to make as to whom he asked to type this up. Now, I just don't think—I am just saying he knows—

"Mr. Rutledge: I apologize. All right. All right. I asked the court reporter to type it up. I am sorry. Forgive me.

"Mr. Clark: Yes." (Pars. ours.)

From the evidence taken on the motion for a new trial, and argument in briefs, it appears that the evidence in the trial was taken consecutively by two court reporters, one of whom was Tribble. The other reporter had written up the transcript of Mims' testimony.

It appears that Tribble's wife was on the jury trying the case.

Counsel for defendant contends that the inaccurate statement that Tribble had typed up Mims' testimony was calculated to import a special degree of accuracy of the transcript in the mind of Mrs. Tribble and also implied to her that her husband had received financial benefit from the plaintiff for typing up the transcript.

There is no intimation in the record that the transcript of Mims' testimony prepared by the second reporter was inaccurate. After the interjection of Mr. Clark's observations as to the impropriety of plaintiff counsel's stating who had typed the transcript, counsel for plaintiff changed his statement to the effect that he had asked the reporter to type up the transcript of Mims' testimony, and asked forgiveness, apparently for misstating that Tribble had typed the transcript. This seemed to satisfy defendant's counsel as he replied, "Yes." Considerable conjecture would have to be indulged to conclude that Mrs. Tribble did not grasp that her husband had not been the reporter who typed up the transcript, and had not received any financial benefit from plaintiff's counsel.

But above all, no actual objection was interposed to the argument. The court's ruling was not invoked. Counsel for defendant seemed satisfied with plaintiff counsel's apology for misnaming Tribble as the reporter. Such misstatement of the name of the reporter certainly cannot be considered so poisonous as to demand a setting aside of the verdict in the ends of justice. The entire matter appears to be another of those incidents frequently arising in trials which upon consideration presents little of real consequence.

The motion for a new trial could not properly have been granted on grounds 29–32.

Lastly, we come to a consideration of grounds 33–37 of the motion for a new trial pertaining to the discovery of new evidence subsequent to the trial.

The rules governing the granting of a motion for a new trial on the ground of newly discovered evidence, have received the consideration of this court in a number of cases and are now well crystalized. Particularly have the essential bases for action by a trial court in such proceedings been discussed in Fries v. Acme White Lead and Color Works, 201 Ala. 613, 79 So. 45, and Forest Investment Corp. v. Commercial Credit Corp., 271 Ala. 8, 122 So.2d 131. In the latter case it is stated:

"The propriety of granting such a motion on the ground of newly discovered evidence must, in this State, be tested by the following settled rules:

"(1) The evidence must be such as will probably change the result if a new trial is granted;

"(2) The evidence must have been discovered since the trial;

"(3) The evidence could not have been discovered before the trial by the exercise of due diligence;

"(4) It must be material to the issue;

"(5) It must not be merely cumulative, or impeaching. McCormack Bros. Motor Car Co. v. Arnold, 223 Ala. 504, 137 So. 288; Fries v. Acme White Lead & Color Works, 201 Ala. 613, 79 So. 45; Birmingham Electric Co. v. Linn, 33 Ala.App. 486, 34 So.2d 715."

We deduce from our reading of the record that it was the court's doubt as to Hutto's veracity, as evidenced by the court's statement dictated into the record, that probably formed the real basis for the court's action in granting the motion for a new trial.

Hutto yet maintained in his examination on the hearing of the motion for a new trial that he had received the air hose injury as he had testified in the trial. He admitted he had not filed a claim with defendant's claim department as he had previously testified, but changed his testimony in this regard to the effect that he had filed his claim with defendant's superintendent, it being customary at that time to handle claims of under $150.00 with the superintendent.

The effect of the defendant's documentary evidence was to show that Hutto had never filed a claim for an air hose injury, but had filed claims for injuries in July 1950, and May 1951, for injuries which included a skinned shin in each instance. These injuries in no wise involved an injury from an air hose.

In 39 Am.Jur., New Trial, Sec. 1169, we find the rule as to granting a new trial because of perjury of a witness set forth as follows:

"However, as a general rule, a new trial will not be ordered on proof of a witness' statement tending to show that his testimony was perjured; and this is true regardless of the showing as to whether or not the witness swears to the statement. As the rule is laid down by a number of courts, conviction of the perjurer, or his death, rendering conviction impossible, is necessary.

\* \* \* \* \* \*

"*Whatever the rule may be in this respect, a new trial will not be ordered where it appears that, eliminating the disputed testimony, there remains sufficient evidence to sustain the verdict.*" (Italics ours.)

We think the testimony of the plaintiff, and of his witnesses Willard and Roberts must be deemed sufficient to sustain the verdict even if Hutto's testimony be laid aside. Hutto's testimony as to having observed properly coupled air hoses come apart when air was turned into them was merely corroborative of Willard's and Roberts' testimony.

Under these circumstances we do not think it can be said with assurance to the degree required that the evidence presented on the motion for a new trial questioning Hutto's testimony would constitute such a probability of a changed result as to justify the granting of a motion for a new trial.

Thus the first required element for granting a motion for a new trial as set forth in Forest Investment Corp. v. Commercial Credit Corp., supra, is lacking.

We also think the fifth essential element set out in the same case is lacking, i. e., the newly discovered evidence must not be merely cumulative *or impeaching*.

"Impeaching testimony" is that designed to discredit a witness, or to reduce the effectiveness of his testimony by bringing forth evidence to show why faith should not be accorded his testimony. Blankenship v. Freeman (Okl.), 440 P.2d 744. Evidence is "impeaching" so as to bar a new trial if it is outside the evidence

already given and impeaches that evidence by attacking the character, motives, integrity, or veracity of the witness who gave the testimony. Johnston v. Belk-Mc-Knight Co., etc., 188 S.C. 149, 198 S.E. 395.

We think it clear that the evidence presented by the defendant on the motion for a new trial relative to the integrity or veracity of Hutto's testimony must be characterized as impeaching testimony.

The underlying reason denying the use of impeaching testimony as a basis for setting aside a verdict or judgment is that such testimony may be discovered in almost every case, and there should be a finality to litigation. See Fries v. Acme White Lead & Color Co., supra.

The well established general rule is that the granting or refusing of a motion for a new trial is a matter resting largely in the discretion of the trial court, and the exercise of this discretion carries with it a presumption of correctness, with the accompanying corollary that the ruling of a trial court on a motion for a new trial will not be disturbed unless plainly and palpably erroneous.

Nevertheless such rule cannot logically be applied where a motion for a new trial may have been granted because of newly discovered evidence if essential conditions precedent for the invocation of the court's action on such grounds is lacking. The evidence shown by the defendant on the motion for a new trial relative to Hutto's testimony being impeaching only, the motion for a new trial, if granted on the ground of newly discovered evidence, was therefore erroneously granted.

It is our conclusion therefore that none of the grounds of the motion for a new trial warranted the granting of the motion. The judgment granting the motion is therefore due to be reversed with the resulting effect that this cause is thereby restored to the posture of a verdict for the plaintiff, and in this posture is re-manded to the court below for entry of an appropriate judgment consonant with the verdict.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON, MADDOX and McCALL, JJ., concur.